## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

KOFI APEA ORLEANS-LINDSAY,

Defendant.

Civil Action No. 02-2528 (CKK)
Criminal Action No. 00-440 (CKK)

# FILED

AUG 2 5 2008

### MEMORANDUM OPINION
(August 25, 2008)

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Currently pending before the Court is Defendant Kofi Apea Orleans-Lindsay's Motion to

Withdraw his guilty plea in the above-captioned criminal case, which he brings pursuant to 28

U.S.C. § 2255. On December 14, 2001, Mr. Orleans-Lindsay ("Petitioner") pled guilty to the

first degree murder of Maryland State Trooper Edward M. Toatley, a person aiding in a Federal

investigation, in violation of 18 U.S.C. § 1121(a)(1). Pursuant to the parties' plea agreement, the

Court proceeded to sentence Petitioner to life imprisonment without the possibility of parole

immediately upon accepting his plea of guilty. A year later, Petitioner moved, initially *pro se*, to

withdraw his guilty plea pursuant to Section 2255, and the Court appointed counsel to represent

Petitioner in connection with his Motion to Withdraw. That Post-Plea Counsel met with

Petitioner, conducted an extensive investigation of the arguments and assertions Petitioner raised

in connection with his Section 2255 Motion, and supplemented Petitioner's Motion as he

considered appropriate. In combination, Petitioner's original *pro se* Motion and his counseled

filings principally argue: (1) that the colloquy the Court conducted with Petitioner during the plea

hearing did not support a factual finding that Petitioner acted with premeditation and after

deliberation, as required for his plea of guilty to first degree murder; and (2) that, in a variety of

ways, Petitioner's Plea Counsel provided constitutionally deficient and prejudicial assistance, which impacted the voluntary, knowing, and/or intelligent nature of Petitioner's guilty plea.

The Court conducted a searching review of Petitioner's original *pro se* Motion, the Supplement prepared and filed by his Post-Plea Counsel, the Government's Opposition to Petitioner's Motion, the exhibits thereto, and Petitioner's counseled Reply. After reviewing those materials, the Court requested that the Government provide the Court with copies of certain letters and videotapes referenced in the parties' filings, which the Court received and has now reviewed. Based upon all of the foregoing, as well as the relevant statutes and case law and the entire record herein, the Court finds that an evidentiary hearing is unnecessary to the resolution of Petitioner's motion. Further, for the reasons set forth below in this Memorandum Opinion, the Court shall deny Petitioner's Motion to Withdraw his guilty plea pursuant to 28 U.S.C. § 2255.

## I: BACKGROUND

A.    *Events Surrounding the Shooting of Trooper Toatley*

1.    *The Shooting of Trooper Toatley on October 30, 2000*

Trooper Edward M. Toatley of the Maryland State Police was shot and killed on the night of October 30, 2000, while acting in an undercover capacity in a federal narcotics investigation. Gov't Opp'n at 1. The following description of the events leading up to Trooper Toatley's shooting is based upon the Government's factual proffer during Petitioner's December 14, 2001 plea hearing, as well as the Court's *in camera* review of two videotapes recorded in Trooper Toatley's undercover police vehicle on the night he was shot.

In August of 2000, Trooper Toatley, in association with other state and local law enforcement officers, initiated an investigation of drug trafficking in the Maryland suburbs

2

located near the District of Columbia border.  Tr. of 12/14/01 Plea Hrg. (hereinafter "Plea Tr.")

at 18:18-22.  In September 2000, as part of the ongoing investigation, Trooper Toatley made a

number of undercover drug purchases from Petitioner.  *Id.* at 18:23-20:8.  On October 12, 2000,

Trooper Toatley was deputized to participate in an Organized Crime Drug Enforcement Task

Force investigation, and on October 13, 2000, a federal investigation was initiated after

consultation with the Federal Bureau of Investigation (FBI) and the United States Attorney's

Office for the District of Columbia (USAO).  *Id.* at 20:9-15.

On the morning of October 30, 2000, Trooper Toatley arranged to meet Petitioner later

the same evening in the vicinity of the Takoma Park Metro Station in Washington, DC, to engage

in another drug transaction.  *Id.* at 20:16-20.  At approximately 8:20 p.m. on October 30, 2000,

Petitioner arrived at the designated meeting place in a silver Mercedes and parked his car.  *Id.* at

20:21-24.  Trooper Toatley was parked nearby, sitting in the driver's seat of an undercover

vehicle equipped with three hidden video cameras.  *Id.* at 20:25-21:3; Gov't Opp'n at 9.  The

video cameras were operating and recording throughout Trooper Toatley's meeting with

Petitioner on the night of October 30, 2000, and captured his shooting.  One of the video cameras

was hidden in the center of the undercover vehicle's dashboard and recorded activity in the front

seat of the undercover vehicle on a video recorder dedicated to that camera.  Plea Tr. at 21:4-6;

Gov't Opp'n at 9-10.  Two other cameras were hidden in the front doors of the undercover

vehicle, and each of those cameras focused across the front seat of the vehicle towards the seat on

the opposite side.  Plea Tr. at 21:7-9; Gov't Opp'n at 10.  Both of the door cameras recorded on a

second video recorder, so that only one could be activated at any time, and Trooper Toatley had a

remote device that allowed him to control which camera was recording at any given time.  Plea

Tr. at 21:8-9; Gov't Opp'n at 10. Throughout the relevant time period, the camera in the driver's door was recording, and was focused on the passenger's seat and passenger's side front door of the undercover vehicle. Gov't Opp'n at 10 n.5. As such, two videotapes were created of the events on October 30, 2000, showing two different perspectives; the videotape recorded from the front of the car generally shows both Trooper Toatley and the passenger, while the videotape recorded from the driver's door generally shows only the passenger. Plea Tr. at 21:11-14.

Petitioner entered the undercover vehicle at approximately 8:20 p.m. on October 30, 2000. *Id.* at 20:25-21:2. Just before Petitioner entered the vehicle, Trooper Toatley can be heard on the video recording describing the sweatshirt Petitioner Orleans-Lindsay is wearing as a "GAP sweatshirt," that is a sweatshirt with the letters "G-A-P" on the front in large white print. *See* Gov't Opp'n, Attach. E (Gov't Proffer of Proof in Support of Plea of Guilty) at 13. Upon entering the undercover vehicle on the passenger's side, Petitioner directed Trooper Toatley where to drive. Gov't Opp'n at 10. Trooper Toatley stated that he expected Petitioner to bring the drugs he planned to sell with him to the meeting place, but nevertheless followed Petitioner's directions as to where to go to retrieve the drugs. Petitioner was the only passenger in the undercover vehicle at the time in question, and the two videotapes provide numerous clear views of Petitioner's face and his distinctive GAP sweatshirt throughout the over fifteen minute drive. Plea Tr. at 21:15-18; Gov't Opp'n at 10.

Throughout the course of that drive, Petitioner can be heard intermittently giving Trooper Toatley specific directions. Plea Tr. at 21:19-20. Petitioner's conversations with Trooper Toatley during the drive can also be clearly heard on the video recorded from the driver's door, and the Court's review of that videotape reveals that Petitioner's conversations with Trooper

4

Toatley were friendly, that the two conversed easily, and that the conversations were of a jocular nature. Of note, during the course of the drive, Petitioner and Trooper Toatley discussed the silver Mercedes that Petitioner drove to the meeting place. Petitioner and Trooper Toatley also discussed Petitioner's then-recent experience of having been tricked by a drug seller who sold him ibuprofen rather than ecstasy, and his desire for revenge against the drug seller. In addition, Petitioner and Trooper Toatley discussed the recent death of one of Petitioner's close friends and again discussed the possibility of revenge in connection with that death.

Just before the undercover vehicle arrived at its final destination, Petitioner asked Trooper Toatley for a cigarette and Trooper Toatley gave him one. Plea Tr. at 21:24-25. On the videotapes, Petitioner can be seen lighting and smoking the cigarette when he exits the undercover vehicle. Gov't Opp'n at 11 n.7. After the undercover vehicle arrived at the 2000 block of Douglas Street, NE in the District of Columbia, Petitioner instructed Trooper Toatley to park the vehicle. Plea Tr. at 21:25-22:2. Trooper Toatley then turned on the overhead light of the passenger compartment and handed Petitioner $3,500 in prerecorded government funds as cash payment for the crack cocaine Trooper Toatley believed Petitioner would be providing. *Id.* at 22:3-7. Trooper Toatley began to count out the money but Petitioner stopped him, saying he believed Trooper Toatley that the money was all there. Gov't Opp'n at 55. Trooper Toatley then jokingly asked Petitioner whether he was going to run with the money, and Petitioner feigned insult, saying he was being "disrespected." *Id.* After telling Trooper Toatley that he would be gone for five minutes, Petitioner left the undercover vehicle, still carrying the cigarette that Trooper Toatley had given him. Plea Tr. at 22:7-9.

Approximately thirty seconds later, Petitioner returned to the passenger window of the

undercover vehicle to tell Trooper Toatley that his lights were on.  Gov't Opp'n at 11 n.8.

Trooper Toatley then watched Petitioner walk away, and made a cell phone call to surveillance

personnel to advise them that Petitioner had left the vehicle and was out of Trooper Toatley's

sight.  *Id.*  After hanging up his cell phone, Trooper Toatley can be heard telling the surveillance

personnel that the Petitioner was returning to the vehicle.  *Id.*  According to the Government's

Opposition, Trooper Toatley's recorded observations coincide with those of agents in a

surveillance vehicle parked nearby and thus corroborate Petitioner's eyewitness identification by

one of the agents.  *Id.*

Approximately three minutes after returning to the undercover vehicle to tell Trooper

Toatley that the lights were on, Petitioner returned to the passenger window of the undercover

vehicle.  Plea Tr. at 22:10-11, 33:2:4.  During the Rule 11 plea colloquy, Petitioner informed the

Court that while he was away from the undercover vehicle he went "[a]round the corner," *id.* at

33:5-6, and that he did not have any intention of giving Trooper Toatley any crack cocaine when

he exited the vehicle and went around the corner, *id.* at 35:2-19.  When he returned to the

vehicle, Petitioner still had the cigarette that Trooper Toatley had given him and the glow of the

cigarette provides an indication of Petitioner's movements in the darkness outside of the

passenger window.  *Id.* at 22:11-14; Gov't Opp'n at 14 n.14.  After returning to the vehicle,

Petitioner took two or three puffs on his cigarette (causing it to glow more brightly), while

standing outside the passenger window, before throwing the cigarette to the ground and stepping

forward to crush it out with his foot.  Plea Tr. at 22:11-14; Gov't Opp'n at 14 n.14.

Petitioner then opened the front passenger door of the undercover vehicle, causing the

overhead light to illuminate.  Plea Tr. at 22:15.  At that point, Trooper Toatley was seated in the

driver's seat of the undercover vehicle with his hands in his lap, and asked Petitioner "is

everything all right?" *Id.* at 22:16-17. Without responding to Trooper Toatley, Petitioner

removed a gun from the front pocket of his sweatshirt with his right hand and pointed the gun

directly at Trooper Toatley's head. *Id.* at 22:18-20. Upon seeing the gun, Trooper Toatley

reached up with his right hand in an attempt to block the gun, and succeeded in slightly pushing

the gun towards the rear seat area. *Id.* at 22:21-25. Undeterred, Petitioner brought the muzzle of

the gun back to bear on Trooper Toatley's head and fired one shot at close range that entered the

right side of the Trooper's head and exited the left side. *Id.* at 23:1-3. Trooper Toatley's window

was open and the bullet passed into the street area beside the car. *Id.* at 23:4-5. The shooting

occurred at approximately 8:40 p.m. *Id.* at 23:5-6. On the video recorded from the driver's door

of the undercover vehicle, Petitioner can be seen pausing briefly to observe Trooper Toatley

before fleeing the scene. Gov't Opp'n at 12.

Shortly after the shooting, Trooper Toatley was transported to the hospital, where he was

pronounced dead. Plea Tr. at 23:22-24. The next day, a doctor performed an autopsy and

determined that the cause of Trooper Toatley's death was a "gunshot wound to the head with

perforation of the brain," and ruled the death a homicide. *Id.* at 23:25-24:3.

### 2. *The Ensuing Investigation, Arrest, and Indictment*

In investigating Trooper Toatley's murder, law enforcement utilized two accredited

bloodhounds to track the shooter's flight path to a nearby alley. Gov't Opp'n at 12. At the

intersection of two alleys behind the 2000 block of Douglas Street, NE, investigators discovered

a key chain with a tag with the word "Kofi" written on it. *Id.* at 12-13 & n.10; Plea Tr. at 23:7-

12. The key on the key chain fit the silver Mercedes that Petitioner drove to meet Trooper

Toatley on the night of October 30, 2000. Gov't Opp'n at 13. In addition, in a pocket on the key

chain, investigators found a newspaper obituary for the friend whose death Petitioner and

Trooper Toatley discussed during their drive to the 2000 block of Douglas Street, NE. *Id.* at 13

n.11.

Near the curb approximately 50 feet in front of the undercover vehicle, evidence

technicians recovered a .380 caliber projectile or slug. Plea Tr. at 24:23-25. Forensic

examination of that slug indicated that it could have been fired by a Lorcin 380. *Id.* at 24:25-

25:4. The FBI laboratory processed the bullet and recovered DNA evidence from the slug, which

was compared to DNA samples taken from Trooper Toatley shortly after his death. *Id.* at 25:5-8.

Based on that comparison, an FBI DNA expert concluded that the DNA on the slug was that of

Trooper Toatley. *Id.* at 25:8-9. On July 15, 2001, a woman doing yard work in a yard located

along the flight path traced by the bloodhounds discovered a semi-automatic Lorcin 380 pistol

with an obliterated serial number and a partially loaded magazine. *Id.* at 25:24- 26:8; Gov't

Opp'n at 13-14 n.12. An FBI forensic firearms expert examined the Lorcin 380 and determined

that it was consistent with having fired the bullet identified as having killed Trooper Toatley. *Id.*

at 14. A positive identification was not possible, however, because the weapon had been

exposed to the elements for more than nine months. *Id.* at n.13. The Lorcin 380 was also

submitted for metallurgical examination, which resulted in the raising of the obliterated serial

number on the gun. *Id.* at 14. The obliterated serial number was found to match that of a Lorcin

380 that Petitioner had obtained from a friend during the weeks leading up to Trooper Toatley's

shooting. *Id.*; Plea Tr. at 26:9-20.

Finally, crime scene search officers recovered a cigarette butt from a tree box space

8

located near the right front wheel of the undercover vehicle. *Id.* at 24:10-12; Gov't Opp'n at 14 & n.14. The location in which the cigarette butt was recovered is consistent with the location where Petitioner can be seen to throw a cigarette butt on the video recording, and the Government asserts that no other cigarette butts were found in the tree box. *Id.* at n.14. The cigarette butt was submitted to the FBI laboratory for analysis and comparison with Petitioner's DNA. Plea Tr. at 24:12-18. That analysis determined that Petitioner's DNA matched the DNA found on the cigarette butt and that Petitioner's DNA "profile is extremely unusual such that [] the odds of duplication of such a profile are one in 570 quadrillion; that is, 570 followed by 15 zeroes." *Id.* at 24:12-22; *see also* Gov't Opp'n, Attach. C at 4-7 (reports of FBI laboratory DNA analysis).

The day after Trooper Toatley's shooting, Petitioner fled to New York. Plea Tr. at 23:15-21. Shortly after the shooting, Petitioner was identified as the shooter and a warrant was issued for his arrest for First Degree Murder pursuant to a Complaint filed in the Superior Court of the District of Columbia. Gov't Opp'n at 1. Defendant was arrested in the Eastern District of New York on December 13, 2000, and on December 14, 2000, the United States filed a Complaint against Petitioner charging him with Trooper Toatley's murder. *Id.* at 1-2. On November 17, 2000, following a hearing in the Eastern District of New York, Petitioner was ordered to be removed to the District of Columbia. *Id.* at 2. Petitioner was received in this District on November 21, 2000 and made his initial appearance before Magistrate Judge Alan Kay, who ordered Petitioner held without bond pending a hearing under 18 U.S.C. § 3142. *Id.* That preliminary hearing and pretrial detention hearing was held on December 1, 2000 before Magistrate Judge John M. Facciola, who ordered Petitioner held without bond pending action of

the grand jury. *Id.*

On December 20, 2000, a grand jury of the Superior Court of the District of Columbia returned a one-count Indictment in this Court charging Petitioner with the First Degree Murder of Trooper Toatley, pursuant to 18 U.S.C. § 1121(a)(1)(A). *Id.* Petitioner was arraigned before this Court on January 3, 2001. *Id.*[1] On July 18, 2001, a grand jury of this Court returned a superseding Indictment charging Petitioner in four counts. *Id.* at 3. Count One charged petitioner with the first degree murder of Trooper Toatley, a law enforcement officer during the performance of his duties, pursuant to 18 U.S.C. § 1121(a)(1)(A). *Id.* Count Two charged Petitioner with conspiracy to distribute, and possess with intent to distribute, cocaine and cocaine base in violation of 21 U.S.C. § 846. *Id.* Counts Three and Four charged Petitioner, pursuant to 18 U.S.C. § 924(j), with Trooper Toatley's murder with a firearm during and in relation to a crime of violence, and during and in relation to a drug crime, respectively. *Id.*

B.    *Events Leading to the Plea Hearing*

As Counts One, Three, and Four charged offenses for which the maximum punishment was death, the United States advised Petitioner and the Court that, pursuant to Department of Justice policy, the USAO would consider the facts and circumstances in Petitioner's case and make a recommendation to the Attorney General concerning the filing of a notice of intention to seek the death penalty, pursuant to 18 U.S.C. § 3593(a). *Id.* The United States had previously made both the Magistrate Judges and this Court aware of the potential for capital punishment in

---

[1] At that time, the parties agreed, and the Court found, that because the matter carried the potential for capital punishment, the nature of the prosecution was so complex that it was unreasonable to expect adequate preparation and the trial itself with the time limits set forth in the Speedy Trial Act, 18 U.S.C. § 3161. Gov't Opp'n at 2.

Petitioner's case. *Id.* at n.1. As part of the recommendation process, the USAO would offer Petitioner, by his counsel, the opportunity to address the issue of the death penalty in writing and in person with the United States Attorney and those persons designated to assist the USAO in its consideration of capital punishment, prior to the USAO's recommendation to the Attorney General. *Id.* at 3-4. The Court and Petitioner were also advised that once the USAO's recommendation was under consideration by the Attorney General, Petitioner would, by his counsel, have the opportunity to address the issue of the death penalty in writing and in person with the Attorney General and those designated to assist him, before he reached his decision. *Id.* at 4 n.4.

Particular statutory requirements apply to counsel representing defendants charged with crimes that may be punishable by death. Specifically, 18 U.S.C. § 3005 provides:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. . . .

*Id.* In addition, at the time of Petitioner's criminal case, 21 U.S.C. § 848(q)(4)(A) provided:

> Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time . . . before judgment . . . shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5) . . . .

*Id.* In turn, 21 U.S.C. § 848(q)(5) provided:

11

> If the appointment is made before judgment, at least one attorney so appointed
> must have been admitted to practice in the court in which the prosecution is to be
> tried for not less than five years, and must have had not less than three years
> experience in the actual trial of felony prosecutions in that court.

*Id.*

As discussed below, because of Petitioner's guilty plea, the Government never formally

noticed Petitioner that it intended to seek the death penalty in his case. Nevertheless, from the

outset of Petitioner's case, the Court was guided by the concerns addressed in 18 U.S.C. § 3005

and then-applicable 21 U.S.C. § 848(q) in considering the appointment of counsel to represent

Petitioner. Gov't Opp'n at 28. During the hearing in the Eastern District of New York and

following Petitioner's transfer to this District, he was represented by Billy L. Ponds, Esquire. *Id.*

at Attach. A (6/16/05 Aff. of Jeffrey B. O'Toole) (hereinafter "O'Toole Affidavit") ¶ 2. Mr.

Ponds was not a death penalty qualified attorney,[2] and therefore initially arranged for Steven E.

---

[2] Attorneys are considered death penalty qualified when they:
i.  are members of the bar admitted to practice in the jurisdiction or admitted to
practice *pro hac vice*; and
ii.  are experienced and active trial practitioners with at least five years litigation
experience in the field of criminal defense;
iii.  have prior experience as lead counsel in no fewer than nine jury trials of
serious and complex cases which were tried to completion, as well as prior
experience as lead counsel or co-counsel in at least one case in which the death
penalty was sought.  In addition, of the nine jury trials which were tried to
completion, the attorney should have been lead counsel in at least three cases in
which the charge was murder or aggravated murder; or alternatively, of the nine
jury trials, at least one was a murder or aggravated murder trial and an additional
five were felony jury trials; and
iv.  are familiar with the practice and procedure of the criminal courts of the
jurisdiction; and
v.  are familiar with and experienced in the utilization of expert witnesses and
evidence, including, but not limited to, psychiatric and forensic evidence; and
vi.  have attended and successfully completed, within one year of their
appointment, a training or educational program on criminal advocacy which
focused on the trial of cases in which the death penalty is sought; and

Kiersh, Esquire, a death penalty qualified attorney, to serve as his co-counsel. *Id.* Mr. Kiersh,

however, faced a potential scheduling conflict with another extended prosecution and therefore

found it necessary to withdraw from Petitioner's representation. *Id.* Upon learning that Mr.

Kiersh would not be able to assist Mr. Ponds in representing Petitioner, the Court contacted the

Federal Public Defender for the District of Columbia and secured the services of L. Barrett Boss,

Esquire, a death penalty qualified lawyer, and Robert Tucker, an experienced Assistant Public

Defender who had participated in capital litigation but was not death penalty qualified, to

represent Petitioner and assist Mr. Ponds. Gov't Opp'n at 28; O'Toole Aff. ¶ 3. The Court

subsequently learned that Petitioner was not satisfied with Mr. Tucker's and Mr. Boss'

representation. *See* O'Toole Aff. ¶ 3. Accordingly, on May 17, 2001, the Court relieved Messrs.

Ponds, Boss, and Tucker from their representation of Petitioner, and appointed Jeffrey B.

O'Toole, Esquire, and Anthony L. Ricco, Esquire, to represent Petitioner, Gov't Opp'n at 3.

Mr. O'Toole is a highly experienced death penalty qualified attorney who has held

complete litigation responsibility for over 150 jury trials and numerous non-jury trials, has

participated in both civil and criminal litigation before the federal courts, and has represented at

least fifteen defendants charged with federal or state capital murder offenses. O'Toole Aff. ¶ 1.

Mr. Ricco is likewise a death penalty qualified attorney. After appointing Messrs. O'Toole and

Ricco as counsel for Petitioner, the Court became aware that Petitioner sought to continue Mr.

Ponds' representation. The Court therefore held an *ex parte* Status Conference under seal on

---

        vii.  have demonstrated the necessary proficiency and commitment which
             exemplify the quality of representation appropriate to capital cases.

Gov't Opp'n at 27-28 (quoting American Bar Association, *Guidelines for the Appointment and
Performance of Counsel in Death Penalty Cases*, Guideline 5.1 (February 1989)).

June 20, 2001, at which it explained to Petitioner the Court's obligation to select and appoint

death penalty qualified attorneys to represent him, as well as the limitations inherent in that

selection given the small pool of qualified attorneys. The Court also explained to Petitioner that

Mr. Ponds was not death penalty qualified and that there was no reason for continuing his

representation in light of the Court's appointment of *two* death penalty qualified attorneys to

represent Petitioner. While Petitioner had previously been represented by three attorneys–

Messrs. Ponds, Boss, and Tucker–only Mr. Boss was death penalty qualified. Once Petitioner

was represented by Messrs. O'Toole and Ricco, *both* death penalty qualified attorneys, there was

no need for his additional representation by a third, non-death penalty qualified attorney.

Moreover, retaining a third, non-death penalty qualified attorney was not appropriate in light of

the Judicial Conference of the United States' recommendation that "Courts should not appoint

more than two lawyers to provide representation to a defendant in a federal death penalty case

unless exceptional circumstances and good cause are shown." Report of the Proceedings of the

Jud. Conf. of the United States, Sept. 15, 1998, *available at* http://www.uscourts.gov/judconf/

repjc998.html#1.

Upon being appointed to represent Petitioner, Messrs. O'Toole and Ricco assembled a

defense team, which included their associates Edward Wilford, Esquire and Julie Sippel Dietrich,

Esquire, both of whom had been involved in several capital cases. O'Toole Aff. ¶ 4. They also

engaged the services of two investigators to review the Government's evidence and assist in

locating any potential witnesses. *Id.* In addition, Messrs O'Toole and Ricco engaged the

services of Petitioner's family minister, Rev. Albert Appiah, and a Licensed Certified Social

Worker-Clinical, Ms. Lori James-Monroe, specifically for the purpose of investigating and

14

developing evidence to be used in the mitigation during the penalty phase of the trial.  *Id.*

The details of the plea negotiations in Petitioner's criminal case are supplied in Mr.

O'Toole's Affidavit.  In particular, Mr. O'Toole explains that he and Mr. Ricco were aware that

Petitioner had been resistant to Messrs. Tucker's and Boss' suggestion that Petitioner consider a

guilty plea in light of the evidence arrayed against him.  *Id.* ¶ 5.  As a result, they determined that

Petitioner's defense team would not raise the possibility of a plea with him until they had

explored all of the evidence and any defenses that might be available to him.  *Id.*  Mr. O'Toole

also explains that, based on their prior experience in capital litigation, Petitioner's defense team

knew that once the Attorney General had issued a formal notice of intention to seek the death

penalty, any disposition short of trial would have to be approved by the Attorney General.  *Id.* ¶

6.  Further, Petitioner's defense team was aware that then-Attorney General Ashcroft would not

permit a disposition short of trial once a formal notice had been issued under 18 U.S.C. § 3593(a)

unless there was a change in the facts or circumstances that would justify reconsideration.  *Id.*

As such, Mr. O'Toole avers that Petitioner's defense team was aware "that as a practical matter

any [plea] agreement [had to be] forged before the United States Attorney forwarded his

recommendation to the Attorney General." *Id.* ¶ 7; *see also* Gov't Opp'n at 5 ("just as the USAO

was required to obtain the [Attorney General's] authority to seek the death penalty, [Department

of Justice] policy required that in any prosecution in which capital punishment was implicated,

the USAO was required to seek authority for a disposition which permitted the charged defendant

to avoid the death penalty.") (citing *United States Attorney's Manual*, § 9-10.100).

During the summer of 2001, Petitioner's defense team became aware that the United

States Attorney for the District of Columbia had formed a standing committee to advise him in

15

making his recommendation to Attorney General Ashcroft, and was commencing his consideration of his recommendation in this case. *Id.* Indeed, Petitioner's defense team was asked, and agreed, to meet with the United States Attorney and his committee in September 2001 to orally address the issue of the death penalty. *Id.*[3] According to Mr. O'Toole, at the end of that meeting, the United States Attorney "made a comment concerning his willingness to consider any counter-offer we might wish to make on behalf of our client." *Id.* Mr. O'Toole explains that he has since learned that the United States Attorney was referring to a counter-offer to the death penalty, but that, at the time, Petitioner's defense counsel misunderstood the United States Attorney's comment as indicating a willingness to consider a more lenient plea than life without parole. *Id.* Petitioner's defense team therefore determined that they had to immediately broach the subject of a possible guilty plea with Petitioner. *Id.*

Mr. O'Toole avers that by the point they decided to approach Petitioner about a possible guilty plea, Petitioner's defense team "had carefully reviewed and examined the government's case and conducted an investigation of [its] own," including interviewing Petitioner "on numerous occasions and investigat[ing] all leads and information provided by him or suggested by [its] investigation." *Id.* ¶ 9. Petitioner's defense team had also "conducted an extensive and expansive investigation of all facts and circumstances which might be presented in mitigation in the penalty phase should [Petitioner] be convicted of a capital offense." *Id.* According to Mr. O'Toole, Petitioner's defense team "collectively agreed that the United States' case in this matter

---

[3] The record reveals a slight discrepancy as to the date of this meeting: in his Affidavit, Mr. O'Toole avers that Petitioner's defense team met with the United States Attorney for the District of Columbia on September 28, 2001, *see* O'Toole Aff. ¶¶ 6,8, while the Government's Opposition indicates that the meeting occurred on September 5, 2001, *see* Gov't Opp'n at 4. This discrepancy is not material.

was extremely strong," given the quality and persuasive nature of the physical evidence, the existence of Government witnesses, and in particular, the video tapes of Trooper Toatley's shooting. *Id.*

Mr. O'Toole explains that, prior to July 15, 2001, Petitioner's "confidence in his prospects in this case seemed to center around his believe [sic] that because the government had never recovered the murder weapon the government's case was seriously, if not fatally deficient." *Id.* ¶ 8. The recovery of the Lorcin 380 on July 15, 2001, thus "was a grave concern for [Petitioner] and had a serious effect on his outlook regarding his prospects in the case." *Id.* ¶ 10. Believing that "this made him more amenable to the discussion of a plea," Petitioner's defense team broached the topic of a plea with him, which led to several long discussions of a possible plea. *Id.* Mr. O'Toole avers that, during the course of those discussions, Petitioner "for the first time admitted that he was in fact the person seen in the video tape shooting Trooper Toatley." *Id.* According to Mr. O'Toole, the discussions between Petitioner and his defense team resulted in Petitioner authorizing his counsel to offer a plea of guilty to a lesser offense of first degree murder, charged under the District of Columbia code, with an agreed sentence of thirty years. *Id.* ¶ 10. Mr. O'Toole advised the Government of this counter-offer, but it was soon rejected, and Mr. O'Toole was advised that any acceptable plea offer would have to include an agreed sentence of life without the possibility of parole. *Id.* The Government, however, agreed to delay transmitting the United States Attorney's request for death penalty authorization to the Attorney General, in order to allow Petitioner's defense counsel to continue to discuss the possibility of a plea with Petitioner. *Id.*

According to Mr. O'Toole, "[d]uring the next several weeks, separately and in groups,

17

[Petitioner's defense team] had many extended sessions with [Petitioner] during which we reviewed the evidence and the law." *Id.* ¶ 12. Mr. O'Toole avers that these discussions "focused on whether [Petitioner] could legally and factually enter a plea of guilty, [i.e.,] whether there was sufficient evidence as to each element of the [first degree murder] offense to support a plea of guilty and was [Petitioner] able to admit to each of those elements." *Id.* ¶ 14. Mr. O'Toole states that, after considering the facts of Petitioner's case, he and Mr. Ricco "advised [Petitioner] with respect to the government's offer which he ultimately elected to accept." *Id.* ¶ 18.

C.    *The Plea Hearing*

Petitioner's guilty plea was entered pursuant to several documents negotiated over the course of two months, including: (1) the December 14, 2001 Plea Agreement setting forth the terms of Petitioner's guilty plea; (2) the Government's Proffer of Proof in Support of Defendant's Plea of Guilty, which set forth a 21-page summary of the evidence against Petitioner and advised Petitioner of the elements of the offense as to which he was to plead guilty and the maximum sentence for the offense; (3) the Government's Submission in Support of Defendant's Proffered Plea of Guilty, which provided the Court and Petitioner with jury instructions on premeditation, deliberation, and malice aforethought; and (4) Petitioner's Admissions.

The plea proceedings in Petitioner's criminal case were held on December 14, 2001. At the outset of the plea hearing, Petitioner was sworn in and reminded that all testimony he would give during the plea hearing would be under oath. Plea Tr. at 4:23-25. As initial matters, the Court explained the plea process to Petitioner, advising him that he could ask the Court to stop and explain anything and could consult with his attorney at any time. Plea Tr. at 4:1-6. The Court also explained to Petitioner that in order to accept Petitioner's plea, the Court would need

to find that Petitioner was entering the plea knowingly and voluntarily, and that it was what

Petitioner wanted to do, because he would not be able to change his mind once the plea was

entered. *Id.* at 4:7-15. The Court then proceeded to discuss the nature of a plea entered pursuant

to Federal Rule of Criminal Procedure 11(e)(1)(C) (now Rule 11(c)(1)(C)) and Petitioner

confirmed that he wanted to enter such a plea. *Id.* at 5:1-8:21. Also at the outset, the Court

discussed Petitioner's decision to waive the preparation of a presentence report, explaining to

Petitioner that preparing such a report would include a discussion of Petitioner's criminal record,

education, employment history, health and mental health, substance abuse, financial ability to

pay, and other matters. *Id.* at 8:22-10:15. Petitioner confirmed that he had discussed the nature

of and need for a presentence report with his counsel, that he had no questions on the issue, and

that he wanted to proceed with his plea without a presentence report. *Id.* at 10:16-11:8.

The Court then made preliminary inquiries of Petitioner, including whether he had ever

received treatment for any type of mental illness or emotional disturbance, which Petitioner

denied. *Id.* at 11:9-12:22. In addition, the Court asked Petitioner whether he was "completely

satisfied with the services of [his] counsel: Mr. O'Toole, Mr. Ricco, Ms. Dietrich, and Mr.

Wilford," to which Petitioner responded, "Yes," and whether he "at this time agree[d] with the

Court's decision some time ago to change counsel and appoint Mr. O'Toole, Mr. Ricco and their

associates," to which he replied, "Yes." *Id.* at 13:6-12. The Judge recalls that Petitioner smiled

when he answered this question, thus acknowledging that he was satisfied with his counsel and

the Court's decision to appoint Plea Counsel. The Court also reviewed each of the constitutional

rights that Petitioner would give up by pleading guilty, confirming that Petitioner understood

each and every right and wished to give them up by pleading guilty. *Id.* at 13:13-17:1.

19

The Government then proceeded with its factual proffer, which consisted primarily of a reading of an abbreviated version of the Government's written Proffer of Proof filed on the criminal docket. *Id.* at 18:2-10. The Government's factual proffer during the plea hearing was largely identical to the factual background of Trooper Toatley's shooting provided above, much of which was taken directly from the factual proffer. *Id.* at 18-27.[4] After the Government completed its factual proffer, the Court addressed Petitioner and stated:

> Q.  All right.  You've heard the evidence that's been stated by the government. Do you dispute what the government has stated?
> Now some things you will know personally . . . But, in general, do you dispute anything that the government has stated.
> A.  In general, no.
> Q.  Do you contest in any way the findings of the physical evidence that the government has stated?
> A.  No.

*Id.* at 27:25-28:11. The Court also confirmed with Petitioner's counsel that there were no issues regarding the Government's physical evidence. *id.* at 28:12-15.

The Court then focused on Petitioner's Admissions, which were signed by both Petitioner and his counsel, Messrs. O'Toole and Ricco. *See* Gov't Opp'n, Attach. C. In relevant part, Petitioner's Admissions "admit[ted] the following and admit[ted] that the Government would have proven the following elements beyond a reasonable doubt:

> 1. On or about October 30, 2000, within the District of Columbia, I, Kofi Apea Orleans-Lindsay, killed Trooper First Class Edward M. Toatley of the Maryland

---

[4] The Government's oral factual proffer also briefly addressed the evidence that the Government would have presented as to Petitioner's participation in a drug conspiracy, *see* Plea Tr. at 26:21-24, and the Government addresses this evidence in great detail in its Opposition to Petitioner's Motion, *see* Gov't Opp'n at 15-17 n.16. Petitioner did not plead guilty on the drug conspiracy charge and his Motion does not raise any issues regarding the Government's ability to prove his participation in the drug conspiracy. As such, the Court does not address the evidence in that respect in this Memorandum Opinion.

State Police, a human being;
2. I, Kofi Apea Orleans-Lindsay, killed Trooper First Class Edward M. Toatley
knowingly, intentionally and with malice aforethought;
3. That after premeditation and deliberation I, Kofi Apea Orleans-Lindsay, killed
Trooper First Class Edward M. Toatley, and;
4. I, Kofi Apea Orleans-Lindsay, killed Trooper First Class Edward M. Toatley of
the Maryland State Police, while Trooper First Class Edward M. Toatley was
working with the Federal Bureau of Investigation in the furtherance of an
investigation of violations of federal narcotics laws."

*Id.* at 2.  During the plea hearing, the Court confirmed that Petitioner had read his Admissions

carefully, discussed the document with his counsel, and had no questions about it.  Plea Tr. at

28:17-29:1.  The Court then proceeded to ask Petitioner a series of other detailed questions "in

order to make sure that [it had] all of the information in order to be able to accept this plea."  *Id.*

at 29:1-44:19.  Some of the Court's questions required only a "yes" or "no" answer, while others

required more detailed or narrative responses.  In some instances, the Court pursued an additional

narrative response after receiving a simple "yes" or "no" answer from Petitioner.  In addition,

with respect to certain key issues (for instance, premeditation), the Court asked Petitioner

questions in a variety of different ways, in order to ensure the Court's understanding of the

relevant facts, as well as to ensure that Petitioner understood the question on key facts.  *See*

*generally id.*

At the outset of the Rule 11 colloquy, Petitioner admitted that he met Trooper Toatley on

the night of October 30, 2000 and instructed him to drive to an area of Petitioner's choosing,

which was fairly secluded and dark.  *Id.* at 29:19-30:23.  Petitioner admitted that Trooper Toatley

provided him with $3,500 in cash with the expectation that Petitioner would provide crack

cocaine in return, *id.* at 30:24-31:2, and that after leaving the undercover vehicle, Petitioner

returned to the car and shot and killed Trooper Toatley, *id.* at 31:3-10.  Petitioner also admitted to

21

throwing away the Lorcin 380 he used along his escape route and fleeing to New York the next day. *Id.* at 31:11-25.

The Court then focused upon the specific chronology of events surrounding Trooper Toatley's shooting. Petitioner admitted to receiving a cigarette from Trooper Toatley before exciting the vehicle, walking around the corner, returning to finish the cigarette and crush it out while standing by the window, opening the passenger door, pointing the gun at Trooper Toatley, aiming the gun at Trooper Toatley again after he succeeded slightly in pushing it away, and then firing one shot into the right side of Trooper Toatley's head. *Id.* at 32:1-34:13. The Court then continued:

> Q. At what point had you decided to kill Trooper Toatley? We've gone over these events. At what point had you made this decision? Before you met him? At some point you came armed with the gun.
> A. After I got out of the car.
> Q. I take it, though, that you did come with the gun?
> A. Yes.

*Id.* at 34:16-24. The Court then asked Petitioner "had you any intention at the point that you got out of the car to actually give him any crack cocaine?" to which Petitioner responded "No." *Id.* at 35:2-4.

The Court continued:

> Q. Now, you indicated, then, after you got out, as you were walking around the corner or as you were waiting at the corner, at what point did you decide you were going to kill Trooper Toatley?
> A. On the way back.
> Q. So on the way back you decided that you were going to kill Trooper Toatley?
> A. Yes.
> Q. And you obviously took a moment when you arrived at the car to smoke the cigarette, crush it out, before you actually pointed -- pulled the gun and pointed it at him; is that correct?
> A. Yes.

22

> Q. Now, during that period of time were you thinking about or making up your
> mind finally that you would actually go forward and kill him?
> A. Yes.

*Id.* at 35:20-36:11.  Next, the Court confirmed with Petitioner that there was no "provocation,"

nor "anything that Trooper Toatley did, that required you to shoot him at that point."  *Id.* at

36:20-22.  Instead, when the Court asked whether Petitioner was "simply carrying out what [he]

had decided to do?" Petitioner responded, "Simply carrying out what I decided to do."  *Id.* at

36:23-24.  The Court explained to Petitioner that it was making its inquiries "because this is a

first degree murder and your state of mind is at issue, and so the only way we're able to tell about

your state of mind is through actions you took or actions you didn't take."  *Id.* at 36:25-27:5.

The Court then told Petitioner that it was going to explain the legal definitions of

premeditation, deliberation, and malice aforethought to him "so when you respond to my

question as to whether you knowingly and intentionally and with malice aforethought killed

Trooper Toatley . . . you understand what it is that you're actually agreeing to and not just the

summary term."  *Id.* at 37:6-17.  Before providing Petitioner with the legal definitions, the Court

confirmed that Petitioner had discussed premeditation and deliberation with his counsel.  *Id.* at

37:18-20.  The Court explained to Petitioner that "premeditation means forming an intent or

design to kill, and to premeditate is to give thought before acting to taking a human life and then

to reach a definite decision to kill."  *Id.* at 37:21-38:3.  The Court then asked:

> So in this particular instance you indicated that you gave thought as you were
> walking back before you pulled the gun that you were going to kill Trooper
> Toatley.  Is that accurate?
> A. Yes.
> Q. And then at the point that you got to the car, did you make a definite decision
> that you were going to kill him?
> A. Yes.

23

*Id.* at 38:4-10.

Next, the Court explained that "deliberation means considering and reflecting on the preconceived design to kill, turning it over in the mind, giving it a second thought," and that "although premeditation . . . may be as instantaneous as the thought itself, its necessary that there be an appreciable time elapse between formation of the design, the decision, and the fatal act within which there is deliberation." *Id.* at 38:11-20. The Court explained that the "law requires no particular period of time . . . it can be hours, days or longer, or it can be a span of minutes, which would appear to be this case." *Id.* at 38:21-25. After confirming that Petitioner had discussed deliberation with his counsel and had no questions about the concept, the Court asked:

> Q. Now, in terms of -- you indicated that you had made a decision to kill him as you were walking back to the car.
> Did you give it a second thought once you arrived at the car in terms of taking -- making sure that this was not something that you were doing on the spur of the moment, but it was a deliberate act on your part?
> A. I didn't give it a second thought.
> Q. Okay. Did you just come up – I mean, it sounds as if you didn't come up and just simply pull out the gun and shoot him. There seems to have been: You came up, smoked your cigarette, dropped it down. So, presumably, were you thinking about what you were going to be doing at that point?
> A. That's when I made the decision.
> Q. Okay. So you were thinking about it as you were walking up to the car, but made the final decision once you arrived there; is that correct?
> A. Yes.

*Id.* at 39:13-40:4.

The Court then specifically inquired as to Petitioner's plea as to the elements of the charge. In turn, Petitioner indicated that he pled guilty to each of the four elements set out in his Admissions, including agreeing that he killed Trooper Toatley "after premeditation and deliberation as [the Court had] set it out." *Id.* at 40:5-42:5. Nevertheless, in light of Petitioner's

previous comment that he did not give a second thought to killing Trooper Toatley, *see id.* at

39:13-19, the Court then returned to the issue of Petitioner's state of mind.  The Court explained:

> Q.  So if I can -- and I realize that I'm spending some time on this . . . but it is a
> very important feature.  You're not contesting that you were the one that shot
> Trooper Toatley, but the key part to this charge that you're pleading guilty to and
> the difference between this and other kinds of killings that would be viewed less
> seriously and would have a different kind of sanction, as I said, is the state of
> mind, and we need to look at the circumstances surrounding the killing in order
> for the court to come to this conclusion.
> One of the things obviously, you came I take it, prepared with a weapon; is that
> correct?
> A.  Yes.
> Q.  And you were the one who directed Trooper Toatley where to go and where to
> park in order to engage in this transaction; is that correct?
> A.  Yes.
> Q.  And you did receive the $3,500 in cash before you exited from the vehicle; is
> that correct?
> A.  Yes.
> Q.  And is it correct that as you were leaving and went around the corner, that at
> that point you decided you were not going to be giving him any of the crack
> cocaine that this $3,500 was supposed to be purchasing?
> A.  On the way back, yes.
> Q.  Well, at that point you were coming back without any of the crack cocaine; is
> that correct?
> A.  Yes.
> Q.  So I take it that the crack cocaine was not around the corner.  If you were
> going to get it, it would have been from some other place; is that correct?
> A.  Yes.
> Q.  Now when you returned to the undercover vehicle, or to the vehicle where
> Trooper Toatley was seated, you did not have the crack cocaine with you; is that
> correct?
> A.  Yes.
> Q.  And so you were returning at that point in order to murder Trooper Toatley?
> A.  Yes.
> Q.  Once you arrived back at the vehicle in which Trooper Toatley was seated,
> you were standing outside of the vehicle and this is when you had your last puff of
> a cigarette and gave your last additional thought about what you were going to do
> and that you were going to kill him; is that correct?
> A.  Yes.
> Q.  And you opened the door to the car, and in response to the inquiry of Trooper
> Toatley about whether everything was okay, you, without saying anything to him

and without any provocation on his part, pointed the weapon directly at Trooper
Toatley intending to kill him; is that correct?
A. Yes.
Q. And although Trooper Toatley struck -- pushed the pistol away and you could
have at that point not shot him, you then brought the pistol back, aimed it at his
head and deliberately shot him; is that correct?
A. Yes.
Q. And after shooting him, did you stand back before you started to run away?
A. I don't know.  I just walked off.

*Id.* at 42:12-44:19.

After asking whether any party had anything to add, the Court made the following

findings of fact on the record:

> The court has listened to the factual proffer that the government has stated
> . . . [a]nd the court finds that the elements of the offense have been -- would have
> been proven based on the proffer beyond a reasonable doubt from the government.
> The court has also made an inquiry of the defendant . . . and I will find that
> elements have been proven and that [Petitioner] has admitted to those key
> elements. . . .
> In terms of the key elements, which I've indicated, which go to the state of
> mind of the defendant, which one needs to look at in the context of the actions and
> which he has admitted to which go to premeditation, deliberation, that it's done
> knowingly and intentionally and with malice aforethought, the court would point
> to the following evidence which [Petitioner] has agreed and occurred and that
> these were his actions.
> That he brought a weapon with him.
> That he chose the place where they were to park; that he left the decedent,
> having obtained more than $3,500 in cash, went around the corner where he has
> admitted the crack cocaine was not located.
> That he returned to the undercover vehicle.  That at that point he had
> decided not to sell him the crack cocaine and decided to kill him.
> That once [Petitioner] arrived back at the vehicle in which Trooper Toatley
> was seated, that he took a moment to take a puff on his cigarette as he thought
> about whether he was going to go forward and kill Trooper Toatley.
> That he opened the door to the vehicle.  That he responded to -- there was
> an inquiry from Trooper Toatley about whether everything was all right.  He did
> not respond to him.  There was no provocation.  [Petitioner] went ahead and
> pointed the weapon directly at Trooper Toatley.
> Trooper Toatley tried to push it away and was successful to some degree
> in pushing it away.  At that point [Petitioner] could have pulled the gun back, not

26

shot him.  Instead, he brought the pistol back aimed it at Trooper Toatley's head
and deliberately fired one shot into his head.  Trooper Toatley's head.

        After firing the shot, [Petitioner] walked away and then fled up the alley.

        So I will find that all of the elements, including the most important, which
are obviously [Petitioner's] intentions, have been met both by the government and
[Petitioner].

*Id.* at 45:9-48:5.

The Court then carefully reviewed with Petitioner the significant terms of the written Plea

Agreement, confirming that Petitioner had read the Plea Agreement carefully, understood it, and

did not have any questions or confusion about it.  *Id.* at 48:9-25.  As the Government notes, the

Plea Agreement included a "Defendant's Acceptance" portion, which read:

> I have read all six (6) pages of the government's plea agreement and have
> discussed it with my attorneys, Jeffrey O'Toole, Esquire, and Anthony Ricco,
> Esquire.  I fully understand this document and agree to it without reservation.  I do
> this voluntarily and of my own free will, intending to be legally bound.  No threats
> have been made to me nor am I under the influence of anything that could impede
> my ability to understand this agreement fully.  I am pleading guilty because I am
> in fact guilty of the offenses charged.
>
> I reaffirm that absolutely no promises, agreements, understandings, or
> conditions have been made or entered into in connection with my decision to
> plead guilty except those set forth in the plea agreement.  I am satisfied with the
> legal services provided by my attorney in connection with my plea agreement and
> matters related to it.

Gov't Opp'n, Attach. B (Plea Letter) at 6.  Petitioner signed this acceptance on December 14,

2001.  In relevant part, the Plea Agreement informed Petitioner of the charge to which he was

required to enter a plea of guilty, that the parties had agreed that the appropriate sentence for the

charge would be life imprisonment without the possibility of parole, and that it was within the

Court's discretion to order Petitioner to pay a fine.  *See generally id.*  The Plea Agreement also

advised Petitioner that if the Court did not accept the plea agreement, the parties would "return to

the *status quo ante*, that is, all counts of the superseding Indictment in this matter shall remain in

force and this agreement and all of its provisions will be null and void." *Id.* at 2-3.  Finally, the

Plea Agreement advised Petitioner that by pleading guilty, he would be giving up the protections

of "Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410, which

ordinarily limit the admissibility of statements made by a defendant in the course of plea

discussions or plea proceedings if a guilty plea is later withdrawn." *Id.* at 3.  The Plea

Agreement further stated:

> Your client knowingly and voluntarily waives the rights which arise under these
> rules. As a result of this waiver, your client understands and agrees that any
> statements which are made in the course of your client's guilty plea pursuant to
> this plea agreement will be admissible against your client for any purpose in any
> criminal or civil proceedings including if your client's guilty plea is subsequently
> withdrawn. Moreover, in the event your client's guilty plea is withdrawn, your
> client agrees that the government will be free to use against your client in any
> criminal or civil proceeding any statement made during the course of his guilty
> plea pursuant to this agreement.

*Id.*

During the plea hearing, the Court specifically discussed each of these aspects of the Plea

Agreement with Petitioner and confirmed that he understood and agreed to each section.

*See* Plea Tr. at 49:1-65:6.  In particular, the Court focused on Petitioner's waiver of his rights

under Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410, confirmed

that Petitioner had discussed that aspect of the Plea Agreement with counsel, and that Petitioner

was voluntarily waiving his rights under those Rules. *Id.* at 58:22-60:21.  At the end of the

discussion, the Court asked Petitioner whether "as I've gone over it, that this is the entire plea

agreement as you understand it and that there's no other promises that have been made to you or

any other aspects of it; is that correct?" *Id.* at 64:17-20.  Before responding, Petitioner conferred

with his counsel–thus confirming that he understood the Court's previous instruction that he was

free to do so at any time–before responding "Yes." *Id.* at 21-22. The Court then reminded

Petitioner that "it's very important for you to bring up -- if you think that [something's] not in

writing or we haven't talked about it, that there's something else that you understand, because

you can't come back in a week or a year or whatever and say, 'You know, Judge Kotelly, I

thought this or that was part of the agreement.' This is the time to bring it up. Is there anything

else?" Petitioner responded "No." *Id.* at 64:17-65:6.

> Finally, the Court addressed the voluntariness of Petitioner's plea, explaining:

> I want to make sure that you're doing this voluntarily of your own free will; that
> you're not being forced in any way to do this. . . Has anyone forced, threatened or
> coerced you in any way into entering this plea of guilty.
> A. No.
>                   \*      \*      \*
> Q. Now are you entering this plea of guilty voluntarily of your own free will and
> for no other reason?
> A. Yes.
> Q. Are you entering this plea of guilty because you are guilty and for no other
> reason?
> A. Yes.
> Q. Is there anything you don't understand about this proceeding or your plea in
> this case?
> A. No.
> Q. Is there anything you want to ask me or your lawyer before you make a
> decision?
> A. No.
> Q. On the charge of killing a person aiding a federal investigation, which is
> murder in the first degree, premeditated, how do you plead?
> A. Guilty.

*Id.* at 67:24-69:10.

The Court then made findings that Petitioner was competent to enter a guilty plea and that

his plea was knowing, intelligent, and voluntary, announced that it would accept the parties'

recommendation that Petitioner be sentenced to life imprisonment without parole, and found

Petitioner guilty of killing a person aiding a federal investigation. *Id.* at 69:11-70:22.  In

addition, the Court made findings and concluded that it could proceed to sentence Petitioner

without the preparation of a presentence report. *Id.* at 70:23-72:12.  As agreed by the parties in

advance, the matter then proceeded to sentencing.  After statements by Trooper Toatley's family

members and the Superintendent of the Maryland State Police, as well as allocution by the

Government and defense counsel, *see id.* at 72:13-106:21, the Court sentenced Petitioner to life

imprisonment without the possibility of parole, *id.* at 106:22-108:23.  Significantly, the plea and

sentencing hearings, combined, lasted for over two and a half hours.

       D.     *Procedural History*

      In December 2002, the Clerk's Office received an undated letter from Petitioner

requesting that his plea of guilty be withdrawn.  That letter was forwarded to the Court by the

Clerk's Office and the Court instructed that it be filed as a *pro se* motion pursuant to 28 U.S.C. §

2255.  The Court then ordered that the Government respond to Petitioner's *pro se* Motion and

appointed counsel to represent Petitioner in connection with his Motion (hereinafter "Post-Plea

Counsel").  *See United States v. Orleans-Lindsay*, Criminal Action No. 04-440, Docket Nos. [82,

83, 84].  The Court then afforded Petitioner's Post-Plea Counsel the opportunity to fully

investigate the claims raised by Petitioner in his *pro se* Motion, any additional claims Petitioner

suggested, and any claims Post-Plea Counsel himself deemed worthy of pursuing.  To the Court's

understanding, this investigation included reviewing and examining the Government's evidence,

meeting with Petitioner in person, and following up on all issues Petitioner raised by meeting

with individuals that Petitioner indicated might have relevant information.  After this lengthy

investigation, Post-Petition Counsel filed a Supplement to Petitioner's *pro se* Motion, which

added claims beyond those raised in Petitioner's original Motion.  The Court then afforded the

United States ample time to file its Opposition to Petitioner's Motion, and afforded Post-Plea

Counsel further time to conduct a thorough investigation of the issues raised in the United States'

response and to file a Reply in support of Petitioner's Motion.

Post-Plea Counsel's filings in this matter appear to exhaustively raise all issues and

claims suggested by Petitioner.  The Court notes that each such filing appears to contain a

thorough discussion of those arguments and claims that Post-Petition Counsel deemed most

meritorious.  In addition, Post-Plea Counsel appears to have advanced other arguments at

Petitioner's request.  For those arguments and claims, Post-Plea Counsel indicates Petitioner's

position and provides the Court with any relevant information gleaned from his own

investigation.  The Court also notes that, while Petitioner's *pro se* Motion was signed in the

presence of a Case Manager authorized to administer oaths under 18 U.S.C. § 4004, *see* Pet.'s

Mot. at 10, Petitioner's counseled filings are not supported by any additional affidavits or

declarations.  As such, the only sworn testimony offered by Petitioner is his original Motion.

On May 1, 2008, having thoroughly reviewed all of the parties' filings, the Court issued

an Order noting the claim in Petitioner's filings that, prior to his guilty plea, Petitioner's Plea

Counsel was aware of his alleged depression and/or suicidal ideation by virtue of references in

personal letters that Petitioner claimed were seized by the Government and provided to Plea

defense counsel in discovery.  *See* 5/1/08 Order, Docket No. [130].  The Court's Order noted that

the Government had not responded to Petitioner's assertion in its Opposition, and requested that

the Government answer questions regarding the existence of such letters as well as provide the

Court with copies of any such letters in its custody or control.  On June 27, 2008, the

31

Government filed with the Court copies of nineteen (19) letters written by Petitioner to his then-girlfriend during the period between December 10, 2000 and March 3, 2001. *See* Docket No. [134]. The Court has now thoroughly reviewed those letters and they are discussed below.

In addition, on May 6, 2008, the Court issued an Order requiring the Government to produce copies of the videotapes made in the undercover vehicle on the night of Trooper Toatley's shooting *in camera* for the Court's review. *See* 5/6/08 Order, Docket No. [131]. The Court's Order noted that the parties' filings had placed the videotapes' contents in issue. *Id.* After the Government initially objected to the production of those videotapes, *see* Docket No. [134], the Court held a telephone conference call on the record with Post-Plea Counsel and counsel for the Government, during which all parties agreed to the production of the videotapes *in camera*, *see* Docket No. [135]. The Government produced the videotapes *in camera* to the Court on July 31, 2008, and the Court has now thoroughly reviewed them. Their contents are discussed both above and below.

## II: LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner in custody sentenced in a federal court may move the sentencing court to vacate, set aside, or correct the sentence if the prisoner believes his sentence was imposed "in violation of the Constitution or laws of the United States . . . or that the [sentence] is otherwise subject to collateral attack." 28 U.S.C. § 2255 (2005). "To have a plea set aside on a section 2255 petition, the petitioner must show that the plea proceeding was tainted by 'a fundamental defect which inherently results in a complete miscarriage of justice' or 'an omission inconsistent with the rudimentary demands of fair procedure.'" *United States v. Weaver*, 265 F.3d 1074, 1077 (D.C. Cir. 2001) (quoting *United States v. Farley*, 72 F.3d 158,

162 (D.C. Cir. 1995) (quoting *Hill v. United States*, 268 U.S. 424, 428 (1962)).

A district court may deny a § 2255 motion without a hearing when "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir. 1996). "The decision whether to hold a hearing is committed to the district court's discretion, particularly when, as here, the judge who is considering the § 2255 motion also presided over the proceeding in which the petitioner claims to have been prejudiced." *Fears v. United States*, No. Civ. A. 06-0086 (JDB), 2006 WL 763080, * 2 (D.D.C. Mar. 24, 2006) (citations omitted); *Morrison*, 98 F.3d at 625-26. A Section 2255 petitioner is not automatically entitled to an evidentiary hearing, and should not receive one if his allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962). Rather, to warrant a hearing, the petitioner's § 2255 motion must raise "detailed and specific factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection.'" *United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992) (quoting *Machibroda*, 368 U.S. at 495).

## III: DISCUSSION

Petitioner's *pro se* Motion and counseled filings raise a variety of arguments, some with greater force than others. Principally, Petitioner argues: (1) that the Court's Rule 11 colloquy during Petitioner's plea hearing did not support a factual finding that Petitioner acted with premeditation and after deliberation, as required for a plea of guilty to first degree murder; and (2) that, in a variety of ways, Petitioner's Plea Counsel provided constitutionally deficient and prejudicial assistance, which impacted the voluntary, knowing, and/or intelligent nature of Petitioner's guilty plea. The Court addresses herein each of the claims raised by Petitioner in his

*pro se* Motion and by his Post-Plea Counsel in the additional filings on Petitioner's behalf. Before doing so, the Court briefly addresses Petitioner's claim that an evidentiary hearing is necessary on his Motion, concluding that no such hearing is warranted.

     *A.    Petitioner's Motion Does Not Merit An Evidentiary Hearing*

     As discussed above, an evidentiary hearing on a Section 2255 motion is required only where the Petitioner has raised "detailed and specific factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection.'" *Pollard*, 959 F.2d at 1031 (quoting *Machibroda*, 368 U.S. at 495). In particular, as the D.C. Circuit has explained, "a district court need hold an evidentiary hearing on a plea withdrawal only where the defendant offers 'substantial evidence that impugns the validity of the plea.'" *United States v. West*, 392 F.3d 450, 457 n.4 (D.C. Cir. 2004) (quoting *United States v. Redig*, 27 F.3d 277, 280 (7th Cir. 1994)).

     In considering Petitioner's Motion, the Court initially conducted a through review of all of the parties' filings, which the Court notes were filed after ample time for investigation and analysis. That review revealed only two factual issues that could not be resolved based on the record before the Court and the Court's own personal knowledge and recollection. The Court therefore sought from the Government the additional information necessary to resolve those issues. First, as noted above, Petitioner's filings claimed that defense counsel had received, via discovery from the Government, copies of personal letters Petitioner wrote while in jail prior to his plea, in which he referenced either depression or suicidal ideation on his part. The Government's Opposition did not address Petitioner's claim, either by indicating whether such letters actually existed or explaining the contents of any such letters. *See* 5/1/08 Order, Docket

No. [130]. In order to remedy this void in the record, the Court required the Government to

respond to specific questions regarding the existence of such letters and their contents, as well as

to produce any such letters in the Government's custody or control. *Id.*[5] As noted above, the

Government responded to the Court's Order by answering the questions and providing copies of

nineteen (19) letters written by Petitioner to his then-girlfriend during the period between

December 10, 2000 and March 3, 2001. The Court has now reviewed those letters in great detail

and, as discussed below, determined that they do not present any factual issues whose resolution

requires information outside of the record or the Court's personal knowledge or recollection.

Second, the parties' filings offered significantly different characterizations of the

Government's videotapes of the events surrounding Trooper Toatley's shooting. As such, the

Court concluded that resolving Petitioner's Motion (and determining the need for an evidentiary

hearing) required an *in camera* review of the videotapes, and ordered the Government to produce

them to the Court for review. *See* 5/4/08 Order, Docket No. [131]. The Government has now

produced the videotapes *in camera* to the Court, and the Court has carefully reviewed them.

Prior to this time, the Court had not seen the videotapes.

Having thoroughly reviewed the parties' pleadings, the exhibits attached thereto, the

letters and videotapes produced by the Government, and the entire record in Petitioner's criminal

case, the Court finds that there is no need for an evidentiary hearing on Petitioner's Section 2255

Motion. As explained through the discussion below, Petitioner has not proffered "detailed and

---

[5] The questions were: "1. Did the Government, in fact, seize letters written by Petitioner
while he was in jail prior to his guilty plea?;" "2. If so, did those letters refer to or describe
Petitioner's purported depression or suicidal ideation?;" and "3. If so, did the Government
produce those letters to defense counsel, and when did the Government do so?" *See* 5/1/08
Order, Docket No. [130].

specific factual allegations whose resolution requires information outside of the record or the

judge's 'personal knowledge or recollection,'" *Pollard*, 959 F.2d at 1031, nor has he adduced

"substantial evidence that impugns the validity of the plea,"*West*, 392 F.3d at 457 n.4.  As such,

the Court may resolve Petitioner's Section 2255 Motion without holding an evidentiary hearing.

     B.     *Petitioner's Claims Regarding the Court's Conduct of the Plea Proceeding*

     The Court now turns to the merits of Petitioner's Motion, addressing first his arguments

regarding the Court's conduct of the plea proceedings, and then his arguments regarding his Plea

Counsel's assistance.  Before doing so, however, the Court pauses briefly to clarify a key point

that frames its consideration: Petitioner does not dispute that he shot and killed Trooper Toatley.

As set forth in detail above, Petitioner repeatedly admitted as much under oath during the plea

hearing, *see e.g.*, Plea Tr. at 31:3-10, 32:1-34:16, and he makes no attempt to recant his

admission in his filings in connection with his Motion.  Indeed, in his Reply, Petitioner

"concedes that [] a trial conviction may have been certain, in as much as the conduct he readily

admits, constitutes, at a minimum, the lesser include[d] D.C. Code offense of a felony-murder

offense."  Pet.'s Reply at 26.

     Petitioner thus offers no argument that he is innocent of killing Trooper Toatley.  Rather,

as Petitioner explains in his Reply, his arguments focus on: (1) "what degree of homicide is [he]

fairly accountable for," i.e., did he act with the premeditation and deliberation requisite for a first

degree murder conviction; (2) "was the process by which he arrived at a decision to plead guilty

free of undue coercion by counsel;" (3) "was he mentally stable at the time or clinically

depressed," i.e., was he competent to enter a plea of guilty; and (4) whether his Plea Counsel

provided professionally reasonable assistance in other respects.  *See id.* at 25.  The Court

therefore proceeds to consider these questions, beginning with Petitioner's arguments regarding the Court's conduct of the plea proceedings. In doing so, however, the Court is mindful of the fact that Petitioner has never denied shooting and killing Trooper Toatley.

1.      *Standards Applicable to Petitioner's Rule 11 Claims*

Federal Rule of Criminal Procedure 11 sets out the parameters for pleas in federal court and specifically dictates the procedures the district court must follow in considering and accepting a guilty plea. *See* Fed. R. Crim. P. 11. In relevant part, Rule 11(b)(1) provides that "[b]efore the Court accepts a plea of guilty . . . the defendant may be placed under oath, and the court must address the defendant personally in open court . . . [to] inform the defendant of, and determine that the defendant understands" the variety of procedural and constitutional rights that the defendant gives up by pleading guilty, the impact of the defendant's waiver of those rights, and the nature of the charge and sentence the defendant faces. Fed. R. Crim. P. 11(b)(1). Before accepting a guilty plea, the Court must also "determine that the plea is voluntary and did not result from force, threats, or promises (other than the promises in a plea agreement)." Fed. R. Crim. P. 11(b)(2).

Rule 11(b)(3) additionally requires that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea," Fed. R. Crim. P. 11(b)(3), and in challenging the Court's conduct of the plea proceedings, Petitioner's filings focus on the Court's obligation under Rule 11(b)(3). The Supreme Court has explained that "[r]equiring this examination of the relation between the law and the acts the defendant admits having committed is designed to 'protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually

37

fall within the charge.'" *McCarthy v. United States*, 394 U.S. 459, 468 (1969) (quoting Fed. R. Crim. P. 11, Notes of Advisory Comm. on Crim. Rules).

Significantly, Rule 11 specifically distinguishes between pre- and post-sentencing attempts to withdraw guilty pleas. Before sentencing, a defendant may withdraw a guilty plea that has been accepted by a court if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2). In contrast, "[a]fter the court imposes sentence, the defendant may not withdraw a plea of guilty . . . and the plea may be set aside only on direct appeal or collateral attack." Fed. R. Crim. P. 11(e). Here, while Petitioner had the opportunity to pursue a direct appeal of his plea and sentence, he did not pursue such an appeal and raised his claims for the first time in his Section 2255 Motion.

As such, in considering Petitioner's Rule 11 claims, the Court is cognizant that although Petitioner frames his Motion as one to withdraw his guilty plea, it is in fact a motion to set aside his plea under 28 U.S.C. § 2255. Petitioner's reliance on cases involving the withdrawal of pre-sentencing guilty pleas is therefore inapposite. Equally inapposite is Petitioner's assertion in his Reply that his Rule 11 claim automatically "justifies a voiding of his guilty plea with out [sic] a showing of manifest injustice." Pet.'s Reply at 7. Petitioner purports to base this assertion on *McCarthy v. United States*, in which the Supreme Court held "that a defendant whose plea has been accepted in violation of Rule 11 should be afforded the opportunity to plead anew." 394 U.S. at 472. Since *McCarthy*, however, Rule 11 has been amended to add subsection (h), which provides that "[a] variance from the requirements of [Rule 11] is harmless error if it does not affect substantial rights," and which was specifically added to address court interpretation of the *McCarthy* rule. *See* Fed. R. Civ. P. 11(h) & Advisory Comm. note re: 1983 Amendments. *See*

38

*United States v. Vonn*, 535 U.S. 55, 66-71 (2002).  In light of Rule 11(h), the Supreme Court has

recognized that a "defendant will rarely, if ever, be able to obtain relief for Rule 11 violations

under § 2255," *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004), and that

"collateral relief [under § 2255] is not available when all that is shown is a failure to comply with

the formal requirements of the Rule," *United States v. Timmreck*, 441 U.S. 780, 784 (1979)

(quoting *Hill v. United States*, 368 U.S. at 429).

 In evaluating Petitioner's Rule 11 claims, then, the Court applies the ordinary standard for

Section 2255 motions, set forth above.  To prevail on his Motion, Petitioner must show "that the

plea proceeding was tainted by 'a fundamental defect which inherently results in a complete

miscarriage of justice' or an 'omission inconsistent with the rudimentary demands of fair

procedure.'" *Farley*, 72 F.3d at 162.  This standard is far "more stringent [] than the 'obviously

more lenient 'fair and just' standard'" applied pre-sentencing. *Id.*; *see also United States v.

Dewalt*, 92 F.3d 1209, 1212-13 (D.C. Cir. 1996) (discussing the differences in the standards

applicable to a direct appeal of a guilty plea after sentencing as opposed to on a Section 2255

motion).

### 2.   *Petitioner's Rule 11(b)(3) Claim*

 Petitioner's principal Rule 11 claim is that the Court's colloquy with Petitioner during the

plea hearing did not support a finding that Petitioner killed Trooper Toatley after premeditation

and deliberation, and that the Court therefore erred in determining that there was a factual basis

for the plea.  Petitioner's testimony and admissions during the plea hearing, however, established

a more than sufficient factual basis for the Court's finding of premeditation and deliberation.

Significantly, even though Petitioner's signed Admissions included a statement that Petitioner

killed Trooper Toatley after premeditation and deliberation, *see* Gov't Opp'n, Attach. C at 2, the

Court did not simply accept that Admission.  Instead, the Court devoted substantial attention to

the issues of premeditation and deliberation during the plea hearing and advised Petitioner that it

did so "because this is a first degree murder and your state of mind is at issue, and so the only

way we're able to tell about your state of mind is through actions you took or actions you didn't

take."  Plea Tr. at 36:25-27:5.

    As the Court explained to Petitioner during the plea hearing, "premeditation means

forming an intent or design to kill, and to premeditate is to give thought before acting to taking a

human life and then to reach a definite decision to kill."  *Id.* at 37:21-38:3.  Further, "deliberation

means considering and reflecting on the preconceived design to kill, turning it over in the mind,

giving it a second thought."  *Id.* at 38:11-13.  In addition, "although premeditation . . . may be as

instantaneous as the thought itself, its necessary that there be an appreciable time elapse between

formation of the design, the decision, and the fatal act within which there is deliberation."  *Id.* at

38:14-18.  Nevertheless, the "law requires no particular period of time . . . it can be hours, days

or longer, or it can be a span of minutes, which would appear to be this case."  *Id.* at 38:19-25.

    In arguing that the Court lacked a factual basis for finding that he acted after

premeditation and deliberation, Petitioner's *pro se* Motion notes that when the Court asked

Petitioner "was there a particular reason why you brought the gun that day, that evening?,"

Petitioner responded, "No."  Pet.'s Mot. at 7 (citing Plea Tr. at 41:10-12).  Petitioner's statement

that he did not have a specific purpose in bringing the Lorcin 380 to his meeting with Trooper

Toatley, however, simply indicates that he did not plan to kill Trooper Toatley from the outset of

the meeting on October 30, 2000.  It does not demonstrate that Petitioner did not have a design or

intent to kill Trooper Toatley when he returned to the undercover vehicle having already received

money from Trooper Toatley, without any crack cocaine to give him, and armed with the Lorcin

380.  Nor does it suggest, contrary to Petitioner's admissions on the record during the plea

hearing, that Petitioner did not give definite thought to killing Trooper Toatley before he did so.

Petitioner also focuses on the following dialogue, which occurred after the Court

explained the legal definition of deliberation:

> Q.  Now, in terms of -- you indicated that you had made a decision to kill him as
> you were walking back to the car.
> Did you give it a second thought once you arrived at the car in terms of taking --
> making sure that this was not something that you were doing on the spur of the
> moment, but it was a deliberate act on your part?
> A.  I didn't give it a second thought.

*Id.* at 39:13-19.  Petitioner's Reply describes Petitioner's statement as an "initial, expressed

denial of acting with deliberation."  Pet.'s Reply at 7.  However, when Petitioner's statement is

considered in context, it is unclear whether Petitioner meant to say that he did not give a second

thought to his plan to shoot Trooper Toatley *before* he acted on it, or instead meant to indicate

that he did not give a second thought to having shot Trooper Toatley *after* having done so.  *See*

*id.* at 39:13-40:4.  The latter understanding seems far more likely because immediately after the

dialogue above, the Court asked Petitioner, "So you were thinking about it as you were walking

up to the car, but made the final decision once you arrived there; is that correct?" and Petitioner

responded, "Yes."  *Id.*

Particularly in light of the ambiguity of Petitioner's statement that he did not give a

second thought to killing Trooper Toatley, the Court returned to the issues of premeditation and

deliberation, and explained to Petitioner it was the key portion to his plea of guilty to first degree

41

murder. Plea Tr. at 42:12-20. Significantly, before making any findings regarding premeditation and deliberation, the Court confirmed its understanding of the chronology of the events surrounding Trooper Toatley's death, and Petitioner admitted: (1) that he came armed with a weapon to his meeting with Trooper Toatley; (2) that he directed Trooper Toatley where to go and where to park; (3) that he received cash from Trooper Toatley before exiting the undercover vehicle; (4) that he returned to the vehicle without any crack cocaine; (5) that he returned to the vehicle in order to murder Trooper Toatley; (6) that he gave a final thought to his plan to kill Trooper Toatley as he finished his cigarette; (7) that he opened the door to the vehicle and pointed the Lorcin 380 at Trooper Toatley without any provocation; and (8) that after Trooper Toatley attempted to push the Lorcin 380 away, Petitioner aimed the gun at Trooper Toatley's head and deliberately shot him. *Id.* at 42:12-44:19.

As the D.C. Circuit has stressed, "'[t]he representations of the defendant at a plea hearing as well as any findings made by the judge in accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding' [because] the defendant's 'declarations in open court carry a strong presumption of verity.'" *Farley*, 72 F.3d at 164-65 (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) and citing *Key v. United States*, 806 F.2d 133, 135 (7th Cir. 1986)). The foregoing discussion confirms that Petitioner's representations and declarations during the plea hearing provided a more than sufficient factual basis for the Court's determination that Petitioner killed Trooper Toatley after premeditation and deliberation.

Furthermore, although the Court had not reviewed the videotapes of Trooper Toatley's murder at the time of the plea hearing, it has recently done so. That review confirmed the Court's overall understanding of the series of events surrounding Trooper Toatley's death, as

42

well as its specific findings during the plea hearing. That review also enabled the Court to

determine that a number of assertions raised in Petitioner's Reply are directly undercut by the

videotapes' contents, and therefore must be rejected. First, in his Reply, Petitioner argues that

"[b]ecause the Court never viewed the videotape of the[] events," it improperly concluded that

Petitioner deliberated "over a span of minutes" when, in fact, Petitioner did not have any

"'appreciable' opportunity to deliberate upon a decision to kill." Pet.'s Reply at 9-11. Petitioner,

however, erroneously supposes that the Court reached a specific conclusion as to the length of

Petitioner's deliberations during the plea hearing. The Court did not, and indeed, no such finding

was necessary because as the Court explained, "[t]he law requires no particular period of time."

*Id.* at 38:21.

Continuing on the same theme, Petitioner asserts that the videotape "undercuts any

government claim that [Petitioner] had any opportunity to 'deliberate' if, as described by

[Petitioner], he did not reach a decision to kill until after crushing out the cigarette beside the car

door." *Id.* at 12. Petitioner's characterization of his testimony during the plea hearing is

misleading, however, because his testimony includes three sworn admissions that he thought

about killing Trooper Toatley as he walked back to the undercover vehicle, and that he made his

*final* decision–as opposed to his initial decision–to kill Trooper Toatley as he smoked his

cigarette while standing outside of the undercover vehicle. *See* Plea Tr. at 38:4-10, 40:1-4,

43:22-55:4. In any event, the Court has now reviewed the videotapes and gained an appreciation

of the precise time periods at issue. Based on that review, the Court is confident that Petitioner

had sufficient time to deliberate concerning his decision to kill Trooper Toatley before carrying

out his plan.

43

The Court's review of the videotapes also allows it to reject the two alternative (and mutually inconsistent) explanations for his shooting of Trooper Toatley that Petitioner proffers in his Reply, each of which the Court notes is at odds with his sworn testimony during plea hearing. Specifically, Petitioner "now contends that an objective review of the record shows that the shooting of Trooper Toatley was a spontaneous, impulsive reaction to the Trooper having lunged at the pistol," Pet.'s Reply at 10,[6] and "maintains that the gun discharged accidently [sic] after being shoved by the officer," *id.* at 13. The videotapes of Trooper Toatley's shooting eliminate both of these explanations. Specifically, the videotapes reveal that Petitioner opened the door to the undercover vehicle, withdrew the Lorcin 380 from the front pocket of his sweatshirt, and aimed the gun directly at Trooper Toatley's head while Trooper Toatley's hands were still resting in his lap, and *before* Trooper Toatley lifted his hand to block the gun. Further, it appears from the videotapes that Trooper Toatley's contact with the gun was minimal and thus not sufficient to cause the gun to discharge accidentally. Moreover, the videotapes reveal that after Trooper Toatley succeeded in pushing the gun away slightly, Petitioner brought the gun back to bear on Trooper Toatley's head and fired a single shot. The Court's review of the videotapes thus disproves Petitioner's proffered alternative explanations for Trooper Toatley's shooting, by which he attempts to cast doubt on the Court's factual findings during the plea hearing.

Rule 11(b)(3) requires the Court to determine whether a factual basis exists for a defendant's guilty plea. To accept Petitioner's plea of guilty to first degree murder, the Court

---

[6] Petitioner's counseled Reply states that Petitioner "repeatedly told trial-counsel during plea discussions" that he shot Trooper Toatley as the result of a spontaneous, impulsive reaction. Pet.'s Reply at 10. That statement is not included in Petitioner's *pro se* Motion, which is his only sworn statement in the record, and in any event is belied by the videotape, as discussed below.

was required to determine whether a factual basis existed for concluding that Petitioner killed

Trooper Toatley after premeditation and deliberation.  Petitioner's Admissions and sworn

testimony during the plea hearing were more than sufficient to support the Court's findings in

that respect, and the Court's subsequent review of the videotapes of Trooper Toatley's murder

only serves to confirm its earlier understanding and findings.  Petitioner certainly has not shown

that "the plea proceeding was tainted by 'a fundamental defect which inherently results in a

complete miscarriage of justice' or 'an omission inconsistent with the rudimentary demands of

fair procedure.'" *Weaver*, 265 F.3d at 1077.  Accordingly, the Court rejects Petitioner's claims

that his plea should be set aside because the plea colloquy did not satisfy Rule 11(b)(3).

### 3. *Petitioner's Rule 11(b)(2) Claim*

Petitioner's Reply also advances another claim of Rule 11 error: that Petitioner's guilty

plea was coerced by the manner in which the Court conducted the plea colloquy, such that "the

record does not support a finding of a 'voluntary' . . . entry of the plea under Rule 11(b)(2)."

Pet.'s Reply at 7.  According to Petitioner's Reply, "the Court's [sic] committed error by the

posing of leading questions during th[e] [colloquy] portion of the Rule 11 inquiry . . . and [] such

a process was impermissibly coercive and thereby tainted the Rule 11 inquiry itself." *Id.* at 7-8.

Petitioner does not proffer any case law suggesting that a court's use of leading questions during

a Rule 11 colloquy is coercive, and the Court is not aware of any. *Cf. United States v. Isom*, 85

F.3d 831, 836 (1st Cir. 1996) (rejecting claim that guilty plea was not knowing, voluntary, and

intelligent as a result of the district court's use of leading questions during the colloquy); *Redig*,

27 F.3d at 280-81 (same).  Simply put, a plea colloquy is not a cross-examination and there is no

prohibition on the use of leading questions during a plea colloquy.

45

Moreover, a review of the plea colloquy in this case shows that while some of the Court's questions required only a "yes" or "no" answer, others required, or the Court pursued, a more detailed or narrative response. Indeed, with respect to certain key issues (for instance, premeditation), the Court asked Petitioner questions in a variety of different ways in order to ensure a correct understanding of the relevant facts. Petitioner's responses to the Court's questions were not hesitant, but rather revealed a consistent picture of the relevant facts. Finally, before accepting Petitioner's guilty plea, the Court confirmed that Petitioner had not been forced, threatened, or coerced in any way, that his plea was not the result of any promises, and that he was "entering [his] plea of guilty voluntarily of [his] own free will and for no other reason." Plea Tr. at 67:21-68:25. Petitioner offers no grounds for the Court to revisit its finding that his guilty plea was voluntary and, in light of his numerous admissions and declarations on the record during his plea hearing, does not demonstrate that "the plea proceeding was tainted by 'a fundamental defect which inherently results in a complete miscarriage of justice'" *Weaver*, 265 F.3d at 1077. The Court therefore rejects Petitioner's suggestion that his guilty plea was coerced by the nature of the Court's questioning during the plea colloquy.

### 4.    The Court's Replacement of Petitioner's Defense Counsel

Finally, although not related to the Rule 11 colloquy, Petitioner also assigns error to the Court's decision to remove Mr. Ponds as defense counsel and replace him with Messrs. O'Toole and Ricco. According to Petitioner, Mr. Ponds' removal "resulted in a deterioration of his ability to communicate with his lead counsel," Pet.'s Suppl. at 6, because Petitioner was not familiar with Messrs. O'Toole and Ricco and had no confidence in their representation, Pet.'s Reply at 25. As the Court explained above, its removal of Mr. Ponds was the result of the Court's

obligation under 18 U.S.C. § 3005 and then-applicable 21 U.S.C. § 848(q) to ensure Petitioner's

representation by qualified attorneys in light of the potential for capital charges in his case.

Although Mr. Ponds was not a death penalty qualified attorney at any point during the relevant

proceedings, he was initially assisted by Mr. Kiersh, who was death penalty qualified. When Mr.

Kiersh became unable to continue in his representation of Petitioner, the Court replaced him with

Mr. Boss, a death penalty qualified lawyer, and Mr. Tucker, an Assistant Public Defender

experienced in capital litigation. O'Toole Aff. ¶ 3. Petitioner, however, was not satisfied with

his representation by Messrs. Boss and Tucker, *see id.*, and the Court fortunately was able to

secure the services of Messrs. O'Toole and Ricco, *two* highly experienced death penalty qualified

attorneys. Upon appointing two death penalty qualified attorneys to represent Plaintiff, the Court

determined that Mr. Ponds' services were no longer necessary, particularly in light of the Judicial

Conference's recommendation that only two counsel be appointed to represent death penalty

defendants absent exceptional circumstances.

As discussed above, the Court explained its rationale for replacing Mr. Ponds as defense

counsel to Petitioner during an *ex parte* status hearing in June 2001. Significantly, between that

status hearing and the December 2001 plea hearing, Petitioner never raised the issue of his

representation with the Court nor in any way suggested that he was not communicating

effectively with Messrs. O'Toole and Ricco. Furthermore, during the plea hearing, the Court

specifically asked Petitioner:

> Q. Are you completely satisfied with the services of your counsel: Mr. O'Toole,
> Mr. Ricco, Ms. Dietrich and Mr. Wilford?
> A. Yes.
> Q. *Do you at this time agree with the court's decision some time ago to change
> counsel and appoint Mr. O'Toole, Mr. Ricco and their associates?*

A. *Yes.*

Plea Tr. at 13:6-12 (emphasis added). Petitioner's belated complaints about the Court's change

in his representation are thus undercut by his sworn representations during the plea hearing.

Moreover, Petitioner's complaints fail to establish that the Court somehow erred by fulfilling its

statutory obligations to ensure the quality of Petitioner's representation and respecting the

Judicial Conference's recommendation of two attorneys for defendants facing the death penalty.

C.     *Petitioner's Ineffective Assistance of Counsel Claim*

In his *pro se* and counseled filings, Petitioner raises a variety of grounds for his claim that

his Plea Counsel provided constitutionally deficient and prejudicial assistance. Before turning to

an examination of each of these grounds, the Court notes that Petitioner's ineffective assistance

of counsel allegations focus almost exclusively on Mr. O'Toole despite the fact that, as the

Government points out in its Opposition, "Mr. O'Toole and Mr. Ricco were co-counsel in this

matter and [] all significant decisions in this litigation were the product of their joint

consideration and labors." Gov't Opp'n at 29 n.23 (citing O'Toole Aff). As the Government

also correctly notes, Mr. O'Toole's practice is based in Washington, D.C. while Mr. Ricco's is

based in New York, and it is "understandable, given the situs of their offices, that Mr. O'Toole

had more frequent conduct with [Petitioner]." *Id.* The Court agrees with the Government that

Petitioner "never adequately explains why he did not consult with Mr. Ricco or if he did and Mr.

Ricco agreed with Mr. O'Toole, why Mr. Ricco is not 'ineffective.'" *Id.* at 24 n.25. Further, in

recognition of the fact that Mr. O'Toole and Mr. Ricco jointly represented Petitioner in

connection with his guilty plea, the Court refers to them jointly as Petitioner's "Plea Counsel,"

except where Petitioner makes specific allegations regarding one attorney's conduct.

    *1.*    *Legal Standard for Ineffective Assistance of Counsel Claims*

    To prevail on a claim of ineffective assistance of counsel, a party must successfully meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, a party must show that his attorney's allegedly deficient performance was "so serious that counsel was not functioning as the 'counsel' guaranteed [] by the Sixth Amendment." *Id.* A court conducting such an inquiry should measure attorney performance under "prevailing professional norms," *id.* at 688, and "[j]udicial scrutiny of counsel's performance must be highly deferential," *id.* at 689. A petitioner must overcome a strong presumption that counsel rendered adequate and effective assistance within the "wide range of reasonable professional assistance," *id.*, and must demonstrate that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688. *See also United States v. Askew*, 88 F.3d 1065, 1070-71 (D.C. Cir. 1996) (explaining *Strickland* standard); *United States v. Mitchell*, 216 F.3d 1126, 1130-31 (D.C. Cir. 2000) (same).

    Second, it is not enough to show that counsel's performance was professionally deficient, but there must also be prejudice sufficient to create a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that [counsel's] errors had some conceivable effect on the proceeding," because "[v]irtually every act or omission of counsel would meet this test." *Id.* at 693. Rather, "[i]n the context of guilty pleas. . . the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Significantly, a court considering an ineffective

assistance of counsel claim does not need to address both the deficient performance and

prejudice components of the inquiry if there has been an insufficient showing on one prong. *Id.*

at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which . . . will often be so, that course should be followed." *Id.*

     With varying levels of explicitness, Petitioner claims that his Plea Counsel's allegedly

deficient performance vitiated the voluntary, knowing, and/or intelligent nature of his guilty plea.

A plea of guilty is only constitutionally valid if it "represents a voluntary and intelligent choice

among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. at 56

(quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). However, as the Supreme Court has

explained, where a criminal defendant "is represented by counsel during the plea process and

enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether

counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'"

*Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). Thus "a defendant who pleads

guilty upon the advice of counsel 'may only attack the voluntary and intelligent character of the

guilty plea by showing that the advice he received from counsel was not within the standards'"

for constitutionally effective assistance of counsel set forth in *Strickland* and *McCann*. *Id.*

(quoting *Tollett v. Henderson*, 411 U.S. 258, 267 (1973)).

     2.    *Petitioner's Mental Health-Related Claims*

     Petitioner's *pro se* and counseled filings contain a variety of arguments that Petitioner's

Plea Counsel's conduct was inappropriate in light of Plea Counsel's alleged awareness of

depression and/or suicidal ideation on Petitioner's part. Most significantly, in his *pro se* Motion,

Petitioner alleges that his guilty plea was the result of Mr. O'Toole telling Petitioner that he

"should not give [the] government the power to kill me but I should take the plea then I would

have the power to kill myself whenever I wanted to." Pet.'s Mot. at 2. Petitioner asserts that this

statement was coercive "because counsel knew that I wanted to do harm/kill myself from a letter

that I wrote which was in the discovery package and then played on the state of mind that I was

in." Pet.'s Mot. at 2-3. In addition, Petitioner's counseled filings argue that Plea Counsel failed

to adequately investigate Petitioner's mental health status prior to recommending that he accept a

guilty plea. Pet.'s Suppl. at 2, 10-11. Petitioner variously suggests that he may not have been

competent to enter a guilty plea, *see* Pet.'s Reply at 22, and that his counsel's failure to request a

forensic mental health evaluation prejudiced his ability to raise a competency issue in his Section

2255 Motion, Pet.'s Suppl. at 11-12.

As set forth in *Strickland*, "[a] fair assessment of attorney performance requires that every

effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the

time." 466 U.S. at 689. Moreover, "[b]ecause of the difficulties inherent in making the

evaluation, a court must indulge a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance." *Id.* Assessing Petitioner's mental health-

related claims thus requires the Court to consider the context in which Mr. O'Toole advised

Petitioner regarding the Government's plea offer.

Mr. O'Toole's Affidavit provides both a thorough description of that context and a candid

discussion of Mr. O'Toole's specific comments to Petitioner. As set forth in the background

section above, Mr. O'Toole explains that, when they took on Petitioner's representation, Messrs.

O'Toole and Ricco were aware that Petitioner had been resistant to his previous counsel's

suggestion that Petitioner consider a guilty plea in light of the evidence arrayed against him.

O'Toole Aff. ¶ 5.  As a result, Messrs. O'Toole and Ricco decided not to raise the possibility of a

plea with Petitioner until they had explored all of the evidence and any defenses that might be

available to him.  *Id.*  However, after their September 2001 meeting with the United States

Attorney, Petitioner's defense team determined that it was important to broach the subject of

possible guilty plea with Petitioner.  *Id.* ¶ 7.  According to Mr. O'Toole, Petitioner eventually

admitted that he was the individual in videotapes, and agreed to a plea of guilty to a lesser

offense of first degree murder charged under the District of Columbia code with an agreed

sentence of thirty years.  *Id.* ¶ 10.  After that counter-offer was rejected by the USAO,

Petitioner's defense team "had many extended sessions with [Petitioner] during which we

reviewed the evidence and the law," *id.* ¶ 12, which resulted in Petitioner ultimately accepting

the Government's plea offer, *id.* ¶ 18.

In his Affidavit, Mr. O'Toole candidly admits, "I acknowledge that during my discussions

with [Petitioner] of the government's life without parole plea offer there was an oblique

reference to suicide," and continues to provide the relevant context for that comment.  *Id.* ¶ 13.

Mr. O'Toole explains:

> I recall in substance a conversation in which I explained to [Petitioner] that at that
> time, while awaiting trial for a capital offense, he had little if any control over his
> life and this plea would return some control to him.  In an attempt to make him
> fully comprehend his situation, I explained that in his current situation the
> government would decide where he stayed, what he did, when he did it, who he
> could see and associate with and when he could see them, what he would eat and
> when he could eat it, and if he was convicted and sentenced to death, the
> government would decide when and how he would die.  I explained that by this
> plea he could take back some control of his life, however little.  Once he was
> sentenced he would no longer be in lock-down, he would be among the prison
> population, he could have visits and those visits would eventually be contact

visits. He would have canteen privileges. In short he would have at least some control over his life. At the end of this discourse [Petitioner] remarked that he did not know how he could spend the rest of his life in prison and, without a direct reference to suicide, I replied that once he was in the general prison population he would have at least some control over even that. It was an uncalculated, spontaneous comment meant to help [Petitioner] understand that by entering a plea of guilty he would regain some control over his life and not to suggest suicide. The comment was meant to focus on the issue of control. It was my distinct impression then, and it remains my impression now, that [Petitioner] understood the comment in the context of our discussion and the purpose for which it was offered. I am confident that he knew that I was not in any way suggesting suicide to him.

*Id.*

In addition, Mr. O'Toole unequivocally states:

At no time during the course of the many hours I spent with [Petitioner] did I see or hear anything which would lead me to believe that [Petitioner] was suffering from any mental problems nor did [Petitioner] at any time advise me of any suicidal ideation. Neither did any other member of the defense team, including Rev. Appiah and Ms. James-Monroe, advise me of concerns for our client's mental condition or suicidal ideation. Given that Rev. Appiah was [Petitioner's] minister and Ms. James-Monroe is a Licensed Counseling Social Worker with a clinical practice and thus experienced in mental health issues and also sensitive to the effect such issues can have in mitigation, I feel confident that [Petitioner] never evidenced such problems.

*Id.* ¶ 12.[7] This assertion is the key to assessing Petitioner's claim that his guilty plea was the

result of Mr. O'Toole's coercion because if Mr. O'Toole was unaware of any mental health

issues or suicidal ideation on Petitioner's part, his comment easily falls within the "wide range of

---

[7] In his Reply, Petitioner states his "contention that Attorney O'Toole's statements are inaccurate and can be demonstrated as such, if the Court grants a hearing on his Motion to Withdraw Guilty Plea." Pet.'s Reply at 6. As discussed above, a Section 2255 motion is required only where the Petitioner has raised "detailed and specific factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection.'" *Pollard*, 959 F.2d at 1031 (quoting *Machibroda*, 368 U.S. at 495). Petitioner's pure speculation regarding Mr. O'Toole's sworn statements does not constitute "detailed and specific factual allegations" necessitating a hearing.

53

reasonable professional assistance" described in *Strickland*, 466 U.S. at 689.  Mr. O'Toole's

denial of knowledge of Petitioner's alleged mental health issues is also key to assessing

Petitioner's claim that Plea Counsel rendered constitutionally ineffective assistance by failing to

request a mental health evaluation.

> a.     *There Is No Evidence That Mr. O'Toole's Comment Was Coercive*

As noted above, Mr. O'Toole avers in his Affidavit that he is "confident that [Petitioner]

knew that [he] was not in any way suggesting suicide," when he explained to Petitioner that

pleading guilty would give restore some measure of control over his life,  O'Toole Aff. ¶ 13, and

explicitly denies any knowledge of Petitioner's alleged mental health issues, *id.* ¶ 12.  For his

part, in his *pro se* Motion, Petitioner asserts only that Mr. O'Toole "knew that I wanted to do

harm/kill myself from a letter that I wrote that was in the discovery package."  Pet.'s Mot. at 2.  It

was this reference to personal letters that prompted the Court to order the Government to answer

questions regarding such letters and provide copies of any letters within its custody and control to

the Court for review.  *See* 5/1/08 Order, Docket No. [130].  In response, the Government

explained that it "did not seize any letters from [Petitioner] or from anyone else," but that it had

obtained copies of 19 letters sent by Petitioner to his then-girlfriend dated between December 10,

2000 and March 5, 2001.  *See* Gov't Submission of Def.'s Letters, Docket No. [134] at 10-11.

The Government also related its "recollection that when we provided discovery to [Petitioner's]

counsel Mr. Boss . . . we provided Mr. Boss with copies of the letters."  *Id.* at 11.

The Court has now reviewed those 19 letters, which are apparently the only letters

produced in discovery to Petitioner's defense counsel, and thus the only means by which

Petitioner alleges that Mr. O'Toole would have been aware of his suicidal ideation.  The Court's

review reveals that none of the letters provide any indication of Petitioner's alleged depression. To the contrary, many of Petitioner's letters contain statements like "I'm just great over here," Gov't Submission, Tab J (1/22/01 Letter) at 1, and "I'm as fine as I'm going to get," *id.*, Tab Q (2/21/01 Letter) at 1. The general topics of Petitioner's letters are his feelings for his girlfriend and his questions as to what she is doing while he is in prison. *See generally* Gov't Submission. Significantly, at least one of Petitioner's letters expresses knowledge that the Government has seen some of Petitioner's letters, but expresses no concern in this respect. In his February 21, 2001 letter, Petitioner states, "Oh yeah my lawyer said something about FBI taking some letters from you. Is that true? I don't really care I don't have nothing to hide but if they did why ain't you tell me. I'll know deffinently [sic] Friday [sic]. Whatever anyone has said I will know. sooner or later." *See id.*, Tab S (2/21/01 Letter) at 2.

While certain of the letters suggest that Petitioner became disheartened at points in time between December 2000 and March 2001 (an emotion not unexpected for a young man held in jail, as well as facing the possibility of the death penalty), Petitioner's emotions appear to be tied to his frustrations about being in prison and anxiety about what his girlfriend may be doing while he is in prison. *See, e.g.,*, Tab N (1/31/01 Letter) at 1 ("So I see you are talking to Johnathon. Yes I'm mad right now. Well I don't really know what to say about that. Well, I got a lot to say but I'll hold my tongue. I'm give hurt and upset why I don't know. I don't want to jump to any conclusions or assume . . . That was all that was on my mind and wanting to talk to you."); *see also* Tab P (2/8/01 Letter) at 1 ("I hope that you liked the poem/letter I wrote. I just wrote it off the top of my head Love. I was kind of feeling sad when I wrote it. I almost cried writing it. But I hope you like it and you feel it.").

Significantly, in each instance where Petitioner relates past sadness, he clearly asserts that his spirits have since improved.  For instance, in a letter dated January 22, 2001, Petitioner writes:

> I've been in my feelings the last week or so.  I was down like I don't know what.
> I didn't even read my Bible for that week.  I slept most of the week, didn't talk to
> anyone, and really didn't (call) talk to anyone.  I guess I was depressed or
> whatever you want to call it.  I'm ok now though.  I pulled out of that crap like
> last Thursday.  But I'm back to my regular self now.

Gov't Submission, Tab J (1/22/01 Letter) at 1.  Indeed, in a letter dated the next day, January 23, 2001, Petitioner repeats these sentiments, and adds "I don't think I'm going to get like that again. If I do I'm just going to pray and read my Bible even more."  *Id.*, Tab K (1/23/01 Letter) at 6. *See also* Tab Q (2/12/01 Letter) at 4 ("I've been in my moods lately but I'm alright . . . . Even though I have up's & down's I'm not going to allow these people to break me and drive me crazy like I've seen some other go.").  Further, Petitioner's letters contain no suggestion whatsoever of suicidal ideation.  To the contrary, in the one letter that explicitly references suicide, Petitioner describes two individuals who attempted to hang themselves in jail and states, "That's sad you know."  *See id.*, Tab C (12/12/00 Letter) at 2.  Petitioner certainly does not indicate that he is in any way considering suicide himself.

The letters to which Petitioner apparently points in his *pro se* Motion thus fail to support his claim that Mr. O'Toole was aware of Petitioner's alleged depression and/or suicidal ideation. The Court also notes that in his March 5, 2001 letter to his girlfriend, Petitioner expressed frustration over not being in control of his situation, stating, "I hate not being in control too.  I'm used to doing everything on my own and not depending on anyone!!  Now it's total opposite." *See id.*, Tab. T (3/5/01 Letter) at 2.  While this letter suggests that control over his own life was a

56

significant issue for Petitioner, in the absence of any awareness of Petitioner's alleged depression and/or suicidal ideation, a reference to control on Mr. O'Toole's part is not coercive. Rather, Petitioner's March 5, 2001 Letter suggests that, in raising the issue of control, Mr. O'Toole was addressing an area of concern to Petitioner.

Moreover, none of Petitioner's counseled filings (which the Court notes are not supported by a supplemental sworn statement by Petitioner) provide support for his allegation that Mr. O'Toole was aware of his alleged depression and/or suicidal ideation. Petitioner's counseled Supplement states that Petitioner "places the context of Mr. O'Toole's advice as having been related after [Petitioner] requested that Mr. O'Toole seek a psychiatric evaluation of [Petitioner] because he 'was thinking about killing himself,'" but as support for this statement cites only to Petitioner's reference to personal letters in his *pro se* Motion. Pet.'s Suppl. at 10-11 & n.13. Petitioner's *pro se* Motion, however, does not state that Petitioner asked his Plea Counsel to seek a psychiatric evaluation and, as discussed above, Petitioner's personal letters contain no indication of suicidal ideation.[8]

Similarly, Petitioner's counseled Reply asserts that "[d]uring the period September 28, 2001 up to the plea hearing on December 14, 2001, [Petitioner] began to exhibit symptoms of clinical depression . . . became withdrawn, would spontaneously burst into tears, and would talk to himself." Pet.'s Reply at 21-22. Petitioner, however, proffers no evidence that he exhibited such symptoms, such as jail records. Further, the Court notes that, while Petitioner's Reply states

---

[8] Petitioner's Supplement also states that Petitioner "further contends that he was suffering from 'severe emotional depression' with suicidal ideation' [sic] which went undiagnosed due to plea counsel ineffectiveness," Pet.'s Suppl. at 11, but offers no factual support for this statement.

that Petitioner was placed "in the administrated segregation cellblock" at the D.C. Jail between

September and December 2001, it explains this segregation as the result "of the high-profile

nature of the case," rather than any mental health issues. *Id.* at 21-22. The Court also notes that

one of Petitioner's letters, in the context of explaining to his girlfriend that he seeks solace in

religion by reading the Bible and meditating, states that he started to cry when he was talking to

God. *See* Gov't Submission, Tab G (12/31/01 Letter) at 9-10. Petitioner continues to explain

that he silently communicates with God, and specifically states that this should not be viewed as

a sign that he is "crazy." *Id.* at 10-11. In context, there is nothing to suggest that this episode

suggests any mental health issue. In addition, as noted above, Petitioner states that he almost

cried when writing a poem to his girlfriend, but again, his letter offers no suggestion of any

mental health issue. *See id.*, Tab P (2/8/01 Letter) at 1

Most significantly, even assuming that Petitioner may have experienced symptoms of

depression between September and December 2001 (again, not an unreasonable possibility in

light of Petitioner's situation at that point in time), Petitioner entirely fails to demonstrate that his

defense counsel, and Mr. O'Toole in particular, were aware of those symptoms. Petitioner's

Reply asserts only that Petitioner "referred to his depression in his personal letters written

[between September 28 and December 14, 2001] which indicate an altered mental status," and

that "[t]he government having seized and monitored [Petitioner's] jail correspondence was also

on notice of [Petitioner's] suicidal ideations." *Id.* at 22. Petitioner's Reply does not specifically

identify the alleged letters to which it refers. Again, however, the Government explicitly denies

having seized Petitioner's jail correspondence and appears to have provided the Court with the

only letters potentially fitting Petitioner's descriptions. *See generally* Gov't Submission. As the

Court's review of those letters reveals no indication of Petitioner's alleged suicidal ideation, they provide no support for his claims in that respect.

Finally, the Court notes that, far from demonstrating that Mr. O'Toole was aware of Petitioner's alleged mental health issues, Petitioner's counseled Reply admits that other members of Petitioner's defense team support Mr. O'Toole's claim that he was never advised of any such issues. Specifically, Petitioner's Reply admits that "Ms. James-Monroe confirms the representation contained in Mr. O'Toole's affidavit that she did not observe behavior from [Petitioner] which she would characterize as symptomatic of depression." Pet.'s Reply at 23. Similarly, while Petitioner's Post-Plea Counsel confirms that he has spoken with Reverend Appiah, he provides no indication that Reverend Appiah observed any indications of depression or suicidal ideation. *Id.*[9]

In short, Mr. O'Toole strenuously denies having seen any indication that Petitioner was suffering from mental health issues or suicidal ideation prior to his guilty plea. O'Toole Aff. ¶ 12. Rather than contradict that denial, the other members of Petitioner's defense team appear to support Mr. O'Toole's assertion. The letters to which Petitioner points as purported evidence of his alleged depression and/or suicidal ideation contain no suggestions in that respect, and Petitioner has not identified any other evidence to support his claims. As the record is thus

---

[9] Petitioner's Reply notes Ms. James-Monroe's "conce[ssion] that she meet [sic] with [Petitioner] less than five times and did not conduct a formal assessment of his mental status," as well as Reverend Appiah's apparent explanation to Petitioner's Post-Plea Counsel "that his counseling of [Petitioner] was more in line with pastoral and spiritual counseling and that he lacked the expertise to assess and/or evaluate [Petitioner] in terms of the diagnostic marker of diminished mental capacity or impaired mental functioning." Pet.'s Reply at 23. Neither of these assertions undermines either Ms. James-Monroe's confirmation that she did not observe any behavior symptomatic of depression in Petitioner or Reverend Appiah's apparent lack of observations of that nature.

devoid of evidence that Mr. O'Toole was aware of Petitioner's alleged mental health issues when

he made his challenged comment to Petitioner, the Court concludes that Mr. O'Toole's

conduct falls within the "wide range of reasonable professional assistance" described in

*Strickland*, 466 U.S. at 689.

b.    *Plea Counsel Had No Grounds For Seeking a Mental Health
      Evaluation*

In addition to challenging Mr. O'Toole's comment, Petitioner argues that Plea Counsel

was deficient in failing to seek a mental health evaluation before advising Petitioner to plead

guilty.  *See* Pet.'s Reply at 22; Pet.'s Suppl. at 11-12.  Any obligation on Plea Counsel's part to

request a mental health evaluation, however, would obviously have been premised upon an

awareness of mental health issues on Petitioner's part.  As discussed above, there is no factual

support in the record for Petitioner's assertion that his Plea Counsel became aware of his alleged

mental health issues through his personal letters, and Petitioner offers no evidence that Plea

Counsel gained such knowledge through another avenue.  Petitioner's counseled Reply appears

to suggest that Plea Counsel should have sought a forensic mental health evaluation or other

"professional medical follow-up" after "document[ing] that [Petitioner] suffered a cocaine

induced seizure on September 2, 2000, resulting [in] a brief period of hospitalization."  Pet.'s

Reply at 22.  However, Petitioner's Reply does not explain why an alleged cocaine-induced

seizure should have triggered Plea Counsel to seek a mental health evaluation, and certainly does

not explain how a seizure in September 2000 could in any way have impacted Petitioner's

competency to plead guilty more than 15 months later.[10]  In short, Petitioner altogether fails to

---

[10] In his *pro se* Motion, Petitioner suggests that his Plea Counsel failed to advise him of a
defense of "intoxication at time of killing."  Pet.'s Mot. at 4.  Petitioner's subsequent filings

60

demonstrate that his Plea Counsel had any knowledge of his alleged mental health issues that would have made it appropriate or necessary to request a mental health evaluation before advising Petitioner as to the Government's plea offer.

Petitioner's Reply also suggests that his Plea Counsel should have requested "a delay in the sentencing and that a Presentence Report Investigation be prepared – a process which would have [presented] [Petitioner] with an opportunity to request a contemporaneous professional assessment of his, then, state of mind." *Id.* But again, in the absence of any suggestion that Petitioner was suffering from mental health issues, Plea Counsel was under no obligation to require the preparation of presentence report in order to ensure a mental health evaluation. Significantly, Petitioner does not assert that he ever requested the preparation of a presentence report. To the contrary, the Court explicitly addressed Petitioner's waiver of a presentence report with him during the plea hearing, explaining that such a report "would include your criminal record, your education, employment history, health and *mental health issue[s]*, if any, substance abuse, if that was appropriate, your financial ability to pay and other matters." Plea Tr. at 9:9-17 (emphasis added). After confirming that Petitioner had discussed "the nature of and need for a presentence report" with his Plea Counsel and had no questions concerning the issue, Petitioner expressly opted to "go forward now" "without" the preparation of a presentence report. *Id.* at 10:16-11:8. Petitioner thus voluntarily waived his right to a presentence report, despite being aware that the preparation of such a report would have entailed a mental health evaluation.

Moreover, during the plea colloquy, Petitioner specifically denied having "ever received

---

contain no further argument in this respect, and Petitioner's Reply does not suggest that Petitioner's alleged cocaine-induced seizure in September 2000 had any connection to his sobriety when he killed Trooper Toatley in October 2000.

any treatment for any type of mental illness or emotional disturbance." Plea Tr. at 12:20-22.  In

addition, the Court specifically asked Petitioner, "Have you taken any kind of medication or

anything else in the last 48 hours or anything that would affect your ability to understand what

you're doing by pleading guilty?" and Petitioner responded, "No." *Id.* at 12:12-15.  In accepting

Petitioner's guilty plea, the Court concluded, "I'm satisfied, based on my inquiry, that the

defendant is fully competent, capable of making a decision today.  He understands the nature and

consequences of what he's doing." *Id.* at 69:13-16.  The Court notes that, in addition to

interacting with Petitioner during the plea hearing, the Court interacted with him during a variety

of procedural hearings over the course of his criminal case, including the status hearing regarding

his counsel and another status hearing that addressed Petitioner's Speedy Trial Act rights.

During its interactions with Petitioner, which stretched over a period of almost one year, the

Court did not observe anything in Petitioner's demeanor or behavior that in any way indicated

that Petitioner was suffering from depression, suicidal ideation, or any other mental health issue.

The Court thus saw no need to request a mental health evaluation of Petitioner before accepting

his guilty plea and had no concerns, based on Petitioner's representations on the record during

the plea colloquy, that there was any issue regarding Petitioner's competency to enter his guilty

plea.

Petitioner's filings argue that his Plea Counsel's failure to request a mental health

evaluation caused him "irreparable prejudice" because he "has forever lost the opportunity to

place at issue his mental status in relations [sic] to his decision to plead guilty."  Pet.'s Reply at

22-23.  The Court need not address this argument because, as discussed above, a petitioner

claiming ineffective of counsel must meet *both* parts of the *Strickland* test, and a court deciding

an ineffective assistance of counsel claim does not need to address both the deficient

performance and prejudice components of the inquiry if there has been an insufficient showing

on one prong. *Strickland*, 466 U.S. at 697. Petitioner has not offered any evidence that Plea

Counsel was aware of any mental health issues on his part when they advised him to plead guilty.

In the absence of any such evidence, the Court has no basis for finding that Plea Counsel had any

obligation to request a mental health evaluation of Petitioner and thus no grounds on which to

conclude that Plea Counsel's performance fell outside the "wide range of reasonable professional

assistance." *Id.* at 689. As such, regardless of Petitioner's claim that he has been prejudiced by

his Plea Counsel's failure to seek a mental health inquiry, Petitioner's ineffective assistance of

counsel claim in that respect must fail.

### 3. *Plea Counsel Provided Competent Advice In Encouraging Petitioner to Plead Guilty*

In addition to specifically challenging Mr. O'Toole's comment discussed above,

Petitioner generally argues that his "guilty plea was coerced by his trial counsel's unsound advice

. . . that a death verdict following trial was a virtual certainty." Pet.'s Reply at 18. However,

Petitioner fails to establish that Plea Counsel had a "flawed assessment" of Petitioner's

likelihood of receiving the death penalty at trial. Significantly, while Petitioner's counseled

Reply suggests that Mr. O'Toole's Affidavit reveals an unfounded belief "that the likelihood of a

death verdict was a virtual certainty," Pet.'s Reply at 18-19, Mr. O'Toole's Affidavit does not

support that characterization. Instead, Mr. O'Toole's Affidavit reveals a firm belief that the

Government would have succeeded in obtaining a first degree murder conviction at trial, stating

"there was no doubt in my mind that the government could prove to the satisfaction of any

reasonable juror that [Petitioner] had the requisite premeditation and deliberation when he shot and killed Trooper Toatley." O'Toole Aff. ¶ 14. Mr. O'Toole further suggests that the strength of the Government's evidence against Petitioner "would also adversely effect [Petitioner] in the penalty phase because it would eliminate one of the capital defendant's strongest assets . . . residual doubt of guilty in any individual juror." *Id.* ¶ 17. However, Mr. O'Toole's Affidavit clearly recognizes the distinction between a conviction for first degree murder and a death penalty sentence. *Id.* While his Affidavit reveals Mr. O'Toole's strong belief that a first degree murder conviction was highly likely in Petitioner's case, it does not, as Petitioner suggests, demonstrate that he considered a death penalty verdict "a virtual certainty."

Petitioner likewise fails to support his claim that he was pressured, i.e., coerced, into pleading guilty by his Plea Counsel's "relentless insistence that a guilty plea was [Petitioner's] only viable means to escape a death sentence." Pet.'s Reply at 19. Significantly, Petitioner's counseled Reply states that Petitioner "asserts that Catherine Paukert [a paralegal/investigator who worked on Petitioner's case,] has relevant knowledge and information with respective to the coercive tactics employed by the Court and [Petitioner's] Defense team to force a guilty plea in this case." Pet.'s Reply at 23. Petitioner's Post-Plea Counsel, however, candidly admits that "Ms. Paukert reports that she has no present recollection of being in attendance during plea discussions between counsel and [Petitioner]." *Id.* at 24.

In addition, Petitioner's counseled Reply states that

Mitigation Specialist Lori James-Monroe represented to [Post-Plea Counsel] that while [Petitioner] was initially extremely resistant to accepting a plea bargain to a term of life imprisonment without the possibility of release, he eventually succumbed to tag-team pressure tactics of his defense team. He surrender [sic] his rights to go to a trial not because in [sic] was his wish to do so, but because his

64

> lawyers told him that for him to go to trial was tantamount and equivalent to
> committing suicide.

*Id.* at 23. This alleged "representation" does not come in the form of a sworn affidavit by Ms.

James-Monroe and thus constitutes inadmissible hearsay offered by Post-Plea Counsel.

Moreover, in the absence of a sworn affidavit, the Court has no means of determining whether

Post-Plea Counsel's description reflects Ms. James-Monroe's characterization of Petitioner's

discussions with his Plea Counsel, that of Petitioner, or that of Post-Plea Counsel himself.  The

Court therefore has no basis for considering Post-Plea Counsel's reference to "tag-team pressure

tactics."

     The record is thus devoid of support for Petitioner's claim that Plea Counsel pressured

him into accepting a guilty plea by telling him that proceeding to trial would result in a death

verdict.  Indeed, Petitioner's own statements during the plea colloquy directly refute such a

claim.  During the plea colloquy, Petitioner confirmed that he was "completely satisfied with the

services of" his Plea Counsel, Plea Tr. at 13:6-8, and that he "had enough time to talk with [his]

attorneys and discuss the case and the plea offer and whether or not [he] should accept it or

whether or not [he] should go forward to trial," *id.* at 13:13-16.  Before accepting Petitioner's

guilty plea, the Court specifically stated:

> Q. All right.  Let me move to the last part of this in terms of my plea inquiry, and
> that really gets to the voluntariness of your plea.
>     I want to make sure that you're doing this voluntarily of your own free
> will; that you're not being forced in any way to do this.
>     Now has anyone, including your lawyer, the police, the prosecutor, or
> anybody else that you have spoken to or come in contact with since your arrest,
> promised or suggested to you anything that has made you decide to enter this plea,
> other than what we've talked about on the record?
> A. No.

*    *    *

> Q. Now, are you entering this plea of guilty voluntarily of your own free will and for no other reason?
>
> A. Yes

*Id.* at 67:21-68:22.

In any event, to the extent that Petitioner claims that Plea Counsel strenuously advised him to accept the Government's guilty plea, the Court cannot conclude that Plea Counsel's conduct in that respect was in any way deficient. As Mr. O'Toole's Affidavit correctly explains and the evidence discussed in the Background section above establishes, the first degree murder case against Petitioner was a strong one and proceeding to trial bore a significant risk that Petitioner would be found guilty and possibly sentenced to death. Pleading guilty allowed Petitioner to take the possibility of the death penalty off of the table altogether. "It was in petitioner's best interests, then, to accept the guilty plea, and it was certainly a competent recommendation for counsel to urge him to do so." *Fears*, 2006 WL 763080, at *9 (citing *United States v. Hanson*, 339 F.3d 983, 991-92 (D.C. Cir. 2003) and *United States v. Horne*, 987 F.3d 833, 836 (D.C. Cir. 1993)). The Court cannot second guess Plea Counsel's "'reasonable strategic or tactical judgments,' particularly when the benefit of hindsight supports the conclusion that such judgments furthered petitioner's best interests." *Id.* (quoting *United States v. Loughery*, 908 F.2d 1014, 1018 (D.C. Cir. 1990)). Plea Counsel's advice to Petitioner appears to have represented a justified assessment of the case against him. As such, the Court cannot conclude that Plea Counsel's advice fell below the objective standard of reasonableness expected of competent counsel.[11]

---

[11] Petitioner's counseled Supplement includes two arguments that are clear attempts to rely upon the automatic presumption of prejudice applicable where counsel actively represents a conflicting interest and the conflict affects the counsel's performance. *See United States v.*

Finally, Petitioner suggests that his Plea Counsel's advice that he plead guilty was constitutionally deficient because "counsel, upon starting [sic] case, insisted that I plead guilty to charges before any type of work had been done. Which shows that counsel had a preconceived notion that he thought I was guilty." Pet.'s Mot. at 1. Mr. O'Toole's Affidavit, however, directly rebuts Petitioner's suggestion that Plea Counsel prejudged Petitioner's case by explaining that

> While it is fundamental to death penalty practice that counsel must do all that is possible to save the client's life, nonetheless every offer of disposition which eliminates the death penalty is not an appropriate offer. Such offers must be assessed within the context of the evidence in each case. I have handled death

---

*Taylor*, 139 F.3d 924, 930-31 (D.C. Cir. 1998); *United States v. Bruce*, 89 F.3d 886, 893 (D.C. Cir. 1996); *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980). Neither attempt is availing. First, Petitioner's Supplement asserts that Plea Counsel had a "de facto conflict of interest" because "Mr. O'Toole, in stridently urging that [Petitioner] must accept the guilty plea or face certain execution elevated his own interests in obtaining a 'win' in a capital case above [Petitioner's] right to 'subject the prosecution's case to meaningful adversarial testing.'" Pet.'s Suppl. at 11. Petitioner withdraws that argument in his Reply. *See* Pet.'s Reply at 17. Nevertheless, the Court notes that "[i]n order for there to be an 'actual conflict,' an attorney must be forced to make a choice advancing his own interest at the expense of his client's." *Taylor*, 139 F.3d at 831 (citing *Bruce*, 89 F.3d at 893. Here, even if Petitioner is correct that negotiating a pre-death authorization guilty plea somehow constituted a "win" for Plea Counsel, *see* Pet.'s Suppl. 11 & n.4, by advocating that Petitioner plead guilty, Plea Counsel sought to remove the possibility that Petitioner would receive the death penalty. Plea Counsel's interest was thus aligned with Petitioner's–rather than conflicting–because preserving Petitioner's life was undoubtably in his self-interest.

Second, Petitioner's Supplement suggests that the sentencing process in this case "lost its adversarial character and was thus inadequate representation under the standards of the Sixth Amendment" because Mr. Ricco's allocution took a "solicitous tone toward the government while . . . failing to address any mitigating circumstances." *Id.* at 12. Petitioner's argument in this respect ignores the fact that Petitioner's plea was negotiated under then-Rule 11(e)(1)(C) (now Rule 11(c)(1)(C)) of the Federal Rules of Criminal Procedure. As such, (and as the Court explained to Petitioner during the plea hearing and prior to his sentencing) once the Court accepted Petitioner's guilty plea it was bound to accept the parties' agreed-upon sentence of life imprisonment without parole. *See* Fed. R. Crim. P. 11(c)(1)(C); Plea Tr. at 6:9-9:21. The sentencing in this case was therefore not of an adversarial nature because the Court had no discretion as to Petitioner's sentence once it accepted his guilty plea. Moreover, during the plea hearing, Petitioner specifically confirmed that he understood the nature of a Rule 11(e)(1)(C) plea and the agreed-upon sentence in his case, and wanted to enter such a plea. *Id.*

penalty cases in which the prosecution offered such a disposition and, after assessing the evidence, I recommended that my client reject the offer. That client elected to go to trial and was acquitted of all charges.

[Petitioner's] case presented an entirely different dilemma. The evidence against [Petitioner] was exceedingly strong and not subject to successful legal challenge or significant impeachment.

O'Toole Aff. ¶¶ 15-16.

Further, while Petitioner does not state when Plea Counsel allegedly first suggested that he plead guilty, his assertion that Plea Counsel suggested he do so "before any type of work had been done" is directly undercut by Mr. O'Toole's Affidavit. In particular, Mr. O'Toole avers that Petitioner's defense team purposely did not raise the possibility of a guilty plea with Petitioner until after they conducted a thorough investigation of the evidence against him and the defenses that might be available to him, *id.* ¶ 5, and reached the "collective[] agree[ment] that the United States' case in [Petitioner's] matter was extremely strong," *id.* ¶ 7. According to Mr. O'Toole, Petitioner's Plea Counsel did not raise the possibility of a plea with him "upon starting [the] case," in May 2001, but rather waited until September 2001 to do so. *Id.*

Mr. O'Toole's Affidavit also thoroughly explains how Plea Counsel's conduct in counseling Petitioner was impacted by the time constraints inherent in the process that leads to the Government's formal notice of intent to seek the death penalty under 18 U.S.C. § 3593(a), discussed above. In particular, Petitioner's Plea Counsel was aware "that once a notice of intention to seek the death penalty has been filed, any disposition short of trial must be approved by the Attorney General," and that "once [then-Attorney General Ashcroft] had determined to file a notice pursuant to § 3593(a) he would not permit a disposition short of trial unless there was a change in the facts and circumstances which would justify reconsideration." *Id.* ¶ 6. Plea

68

Counsel also became aware during the summer of 2001 that the United States Attorney had formed a standing committee to advise him in making his recommendation to the Attorney General, the first step towards a formal notice under § 3593(a). *Id.* As Mr. O'Toole explains, in light of these constraints, Plea Counsel understood that "as a practical matter any [plea] agreement must be forged before the United States Attorney forwarded his recommendation to the Attorney General." *Id.* ¶ 7.

In sum, Mr. O'Toole's Affidavit establishes that Plea Counsel acted reasonably, and in fact responsibly, in promptly focusing Petitioner on the possibility of a guilty plea upon becoming aware that the window for negotiating such a plea was closing. Given the constraints inherent in the § 3593(a) procedure, it appears that Plea Counsel correctly determined that a plea would have to be negotiated quickly for Petitioner to stand any chance of removing the possibility of the death penalty altogether. While Petitioner may have viewed Plea Counsel's broaching of a plea agreement as premature, that Court cannot conclude that Plea Counsel's performance in this respect constituted unreasonable professional judgment.

4.    *Petitioner's Claims Regarding DNA and Physical Evidence*

In his *pro se* Motion and counseled filings, Petitioner asserts that he lacked information necessary to make an informed decision about his guilty plea because Plea Counsel did not "obtain independent scientific examination/analyst [sic] of the DNA, fingerprint and ballistic evidence produced by the Government in discovery," Pet.'s Suppl. at 2, and failed to challenge the DNA evidence as unreliable under the standard set forth in *Daubert v. Merrill Dow*, 509 U.S. 579 (1993). At the outset, the Court clarifies a few initial issues regarding Petitioner's claims. First, while two types of DNA evidence were developed in this case–analysis of the DNA on the

69

.380 caliber slug found outside of the undercover vehicle as well as analysis of the DNA on the cigarette butt found in the tree box beside the undercover vehicle–Petitioner's arguments regarding DNA evidence focus on the analysis of the cigarette butt. Second, in his *pro se* Motion, Petitioner asserts that his Plea Counsel refused to get an independent analysis of the DNA evidence "because other companies would not go against Cellmark's finding," but does not identify Cellmark's role in the DNA analysis in this case. Pet.'s Mot. at 3. The Government's Opposition provides some explanation, indicating that the Government was "[a]ware that Cellmark Laboratories was being considered for the defense DNA evidence," and that in light of Petitioner's statement in his *pro se* Motion, "it appears likely that the results of Cellmark's analysis on behalf of the defense was consistent with the FBI analysis, although the government never received the results of the Cellmark analysis because this matter did not go to trial." Gov't Opp'n at 15 n.15. Finally, the Court notes that, to the extent that Petitioner's arguments regarding the DNA evidence are premised on an assumption that another company's analysis might have led to a conclusion contrary to that of the FBI and Cellmark, *see* Pet.'s Suppl. at 3, that assumption is entirely speculative because there is no evidence that any other company ever analyzed the DNA evidence in this case or would have reached another conclusion if it did so.

As discussed above, the FBI laboratory analyzed the DNA found on the cigarette butt near the undercover vehicle, determined that that DNA matched Petitioner's DNA, and also determined that Petitioner's DNA "profile is extremely unusual such that [] the odds of duplication of such a profile are one in 570 quadrillion; that is, 570 followed by 15 zeroes." Plea Tr. at 24:10-22; *see also* Gov't Opp'n, Attach. C at 4-7 (reports of FBI laboratory DNA analysis). Petitioner's counseled filings admit that "mounting an effective challenge to the government's

DNA evidence [] may not have given rise to a reasonable probability of acquittal." Pet.'s Suppl.

at 3; Pet.'s Reply at 28 ("[Petitioner] has never suggested that a *Daubert* challenge would have

resulted in the complete exclusion of the DNA evidence in this case."). Petitioner nevertheless

argues that Plea Counsel provided ineffective assistance by failing to attempt to discredit the

Government's DNA evidence "as based on a methodology which lacked the requisite degree of

acceptance within the scientific community to substantiate a claim of a match." Pet.'s Suppl. at

3. Simply put, the Court disagrees.

Petitioner claims that the DNA evidence in this case "was susceptible to a promising

challenge" under *Daubert* because the "Profiler-Plus and Cofiler Kits used by the [FBI] and

[Cellmark] have not been developmentally validated pursuant to the requirements listed in the

Technical Working Group on DNA Analysis Methods or the DNA Advisory Board of the [FBI]."

*Id.* at 2. In his Affidavit, however, Mr. O'Toole explains that Plea Counsel specifically explored

the possibility of such a challenge with an expert witness:

> Mr. Ricco had consulted with Dr. Lawrence Kobilinski of the John Jay College of
> Criminal Justice in New York City, a noted expert on DNA evidence who had
> worked with Mr. Ricco in the past. Dr. Kobilinski reviewed the results of the
> DNA analysis by the FBI and advised that he saw no challenge to the
> government's DNA evidence which presented a reasonable chance of success,
> including a claim that the FBI's "profiler" method was out-dated and less reliable
> than others in use at that time.

O'Toole Aff. ¶ 11. Plea Counsel thus pursued the exact challenge that Petitioner now claims it

was deficient in not pursuing, received a noted expert's opinion that such a challenge was not

viable, and therefore determined not to pursue it. The Court certainly cannot conclude that this

conduct "fell below an objective standard of reasonableness," as Petitioner claims.

Moreover, as the Government explains in great detail in fifteen pages of its Opposition, a

variety of federal and state courts have found the method of DNA analysis ("PCR/STR")

performed by the FBI in this case to be admissible under *Daubert* and Federal Rule of Evidence

702. *See* Gov't Opp'n at 39-53. The Court does not repeat herein the Government's

detailed–and accurate–explanation. Instead, the Court simply notes that the PCR/STR method

was endorsed by the National Academy of Science's National Research Council ("NRC") in its

1996 report. *See* Gov't Opp'n at 50-51. In addition, as this Court has previously noted:

> numerous federal courts in a variety of jurisdictions have analyzed whether the
> introduction of DNA evidence garnered by from the FBI Laboratory's use of
> PCR/STR analysis comports with the requirements laid down in *Daubert*. These
> courts have been virtually unanimous in finding that the use of PCR DNA testing
> is admissible, and many of these courts have taken judicial notice of the general
> reliability or such tests [citations omitted]. . . .Given the weight of this authority,
> this Court concludes that as a general matter, PCR/STR DNA testing meets the
> strictures of *Daubert* and is admissible.

*United States v. Morrow*, 374 F. Supp. 2d 51, 61-62 (D.D.C. 2005) (Kollar-Kotelly, J.).

Petitioner's filings offer no reason to revisit this conclusion, and the Court therefore does not.

Instead, the Court agrees with the Government that "[c]ounsel such as Messrs. Ricco and

O'Toole, experienced in the litigation of complex cases, in the litigation of cases involving DNA

evidence and, most importantly, in the litigation of capital cases, examining this legal landscape

after consulting with a DNA expert," could legitimately have concluded that attempting to

challenging the Government's DNA evidence would be to no avail. Gov't Opp'n at 52. As such,

Plea Counsel's decision not to do so certainly falls within the "wide range of reasonable

professional assistance" required under *Strickland*.[12]

_____

[12] Petitioner's Reply suggests that Plea Counsel were deficient in failing to challenge the
DNA evidence in this case because they "had available to them information regarding
contemporaneous litigation in the States of Maryland and Michigan that a motion in limine to
preclude the admission of DNA evidence produced by the [Cofiler and Profile Plus methods]

Petitioner therefore cannot establish that Plea Counsel was deficient in deciding not to mount a legal challenge to the Government's DNA evidence in this case, and likewise cannot establish that Plea Counsel's decision was in any way prejudicial. As the Government correctly notes, even the best case scenario–an independent DNA analysis that contradicted the analysis performed by the FBI and Cellmark–would only have created a "battle of the experts," and would not have led to the complete exclusion of the Government's DNA evidence. Gov't Opp'n at 53. Further, while Petitioner suggests that an independent analysis of the DNA evidence might have provided him with information relevant to his decision of whether to plead guilty, *see* Pet.'s Mot. at 3, the DNA evidence at issue only served to identify Petitioner as the individual who smoked the cigarette found in the tree box near the undercover vehicle. Petitioner, however, admitted to his Plea Counsel that he was the individual seen in the Government's videotapes smoking the cigarette, *see* O'Toole Aff. ¶ 10, and repeatedly admitted to the Court during the plea hearing that he shot and killed Trooper Toatley. As Petitioner's Supplement admits, "the videotape largely eliminated the issue of identification as a basis on which to mount a defense." Pet.'s Suppl. at 9. In light of these admissions, it is virtually impossible that an independent DNA analysis would have provided Petitioner with information that would have led him to not plead guilty and instead insist on going to trial. *See Hill v. Lockhart*, 474 U.S. at 58-59.

---

could have been litigated on [Petitioner's] behalf." Pet.'s Reply at 28. This assertion is in direct conflict with Petitioner's statement in the preceding sentence that he has "never suggested that a *Daubert* challenge would have resulted in the complete exclusion of the DNA evidence in this case." *Id.* In any event, litigation in Maryland or Michigan involving *Daubert* challenges to PCR/STR testing does not establish that Plea Counsel could have successfully pursued a challenge to the DNA evidence in this case, particularly because, as discussed above, courts considering the use of the PCR/STR method "have been virtually unanimous in finding" it admissible under *Daubert*. *Morrow*, 374 F. Supp. 2d at 62.

Finally, Petitioner' *pro se* Motion also claims that his Plea Counsel provided ineffective assistance by not getting "results from the fingerprints taken from the gun, car door, shell casing, and cigarette butt as I asked him to." Pet.'s Mot. at 3. However, each of these pieces of physical evidence served to identify Petitioner as Trooper Toatley's shooter. As there is no longer any question of identification, Petitioner cannot demonstrate that Plea Counsel's alleged failure to pursue fingerprint evidence caused him any prejudice.

5.      *Petitioners' Claims Regarding Plea Counsel's Advice*

The final category of arguments Petitioner advances in his filings involve Plea Counsel's alleged failures to advise Petitioner of various defenses available to him as well as the elements of first degree murder. Specifically, in his *pro se* Motion, Petitioner asserts that his counsel failed to advise him of the defenses of temporary insanity, intoxication, and manslaughter, suggesting that those defenses "would most likely [] have succeeded at trial, or I would not have been found guilty of first degree and I would not have been sentenced to death." Pet.'s Mot. at 4. Petitioner, however, offers absolutely no evidence to demonstrate that either a temporary insanity or intoxication defense would have been appropriate in his case and does not suggest that he told his Plea Counsel that he was suffering from any mental health issues or was intoxicated at the time of Trooper Toatley's shooting. As such, the Court has no grounds on which to conclude that Plea Counsel acted unreasonably if it failed discuss those defenses with Petitioner, nor any basis for concluding that Petitioner was prejudiced by his Plea Counsel's alleged failure to raise defenses that may not have been available to him.

By referring to a manslaughter defense, Petitioner presumably suggests that his Plea Counsel failed to advise him that he could defend against a first degree murder charge by

showing that he did not kill Trooper Toatley after premeditation and deliberation or by showing

that he lacked the specific intent to do so. Again, it is not clear that such a defense was available

to Petitioner, in light of Mr. O'Toole's statement that during Plea Counsel's "discussions with

[Petitioner there was no] doubt that when he returned to the undercover vehicle he had formed

the intent to murder Trooper Toatley." O'Toole Aff. ¶ 14. Further, Petitioner's admissions on

the record during the plea colloquy provide ample evidence that Petitioner killed Trooper Toatley

after the premeditation and deliberation required for a first degree murder conviction. As such,

the Court cannot conclude that Petitioner's Plea Counsel was deficient in failing to advise

Petitioner of a manslaughter defense.[13]

In addition to claiming that Plea Counsel failed to advise him of defenses, Petitioner

claims that Plea Counsel failed to correctly inform him as to the premeditation and deliberation

elements of the first degree murder charge. Pet.'s Mot. at 4-5.[14] This assertion again conflicts

---

[13] Petitioner's Reply correctly asserts that "[t]rial counsel in a capital case has an obligation to completely investigate and present mitigating evidence, including evidence of a diminished mental capacity or impairment, sexual and social abuse or serve privation." Pet.'s Reply at 24. Petitioner also, however, recognizes the Supreme Court's "emphasi[s] that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)). Here, Petitioner entirely fails to explain what, if any, mitigating evidence existed in this case and therefore cannot establish that Plea Counsel's performance was in any way deficient for failing to uncover unspecified mitigating evidence. Moreover, in direct contradiction to Petitioner's suggestion that Plea Counsel failed to develop mitigating evidence, Mr. O'Toole's Affidavit explicitly states that Reverend Appiah and Ms. James-Monroe were engaged *as mitigation specialists* and "would investigate and develop evidence to be utilized in mitigation during the penalty phase of the trial." O'Toole Aff. ¶ 4.

[14] In his *pro se* Motion, Petitioner also asserts that he was "not informed by counsel that I did not have to answer any questions at the plea hearing and that I could have pled the Fifth. If I would have known that I would have chose to plead the Fifth to any questions asked by the Court." Pet.'s Mot. at 5-6. Petitioner's assertion is nonsensical because Rule 11 specifically requires a court considering a guilty plea to address the defendant personally in open court and

directly with Mr. O'Toole's Affidavit, which states:

> Throughout the course of our discussions of pleas with [Petitioner] . . . we focused on whether [Petitioner] could legally and factually enter a plea of guilty. That is, was there sufficient evidence as to each element of the offense to support a plea of guilty and was [Petitioner] able to admit each of those elements. . . . and our discussions with [Petitioner] were always about first degree murder and its elements. . . . "

O'Toole Aff. ¶ 14. Petitioner's assertion is likewise in direct conflict with Petitioner's testimony during the plea hearing–both before and after the Court explained the legal definitions of premeditation and deliberation–that he had discussed the concepts with his Plea Counsel and had no questions as to their meanings. Plea. Tr. at 37:11-20; 39:6-12. In any event, as discussed in great detail above, the plea colloquy in this case included numerous in-depth discussions of the elements of premeditation and deliberation, which more than adequately establish that Petitioner understood those elements at the time of his guilty plea. Petitioner persevered in pleading guilty in the face of the Court's explicit explanation of the elements of premeditation and deliberation. Petitioner therefore cannot demonstrate that, but for his Plea Counsel allegedly misinforming him as to those elements, he would not have pled guilty and would have insisted on going to trial. To the contrary, the record of the plea hearing establishes that Petitioner chose to plead guilty armed with a complete understanding of the elements of his charge.

### 6. *Petitioner Altogether Fails to Show That Plea Counsel's Conduct Was In Any Way Prejudicial*

The foregoing discussion reveals that, although Petitioner attempts to assign error to a variety of Plea Counsel's actions and choices during Petitioner's representation, that

---

determine that the defendant understands a variety of matters. Fed. R. Crim. P. 11. The Court clearly could not meet its Rule 11 burden and therefore could not accept a guilty plea if a defendant opted not to respond to questioning during a plea hearing.

representation was in all respects well "within the wide range of reasonable professional

assistance." *Strickland*, 466 U.S. at 689. This conclusion is fatal to Petitioner's ineffective

assistance of counsel claim and the Court therefore need not even consider Petitioner's ability to

show prejudice. *See id.* at 698 ("there is no reason for a court deciding an in effective assistance

claim . . . even to address both components of the inquiry if the defendant makes an insufficient

showing on one."). Nevertheless, the Court reiterates that Petitioner's various filings entirely fail

to show "that there is a reasonable probability that, but for counsel's errors, he would not have

pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. at 59. As

the Supreme Court has explained,

> In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry
> engaged in by courts reviewing ineffective-assistance challenges to convictions
> obtained through a trial. For example, where the alleged error of counsel is a
> failure to investigate or discover potentially exculpatory evidence, the
> determination whether the error 'prejudiced' the defendant by causing him to
> plead guilty rather than go to trial will depend on the likelihood that discovery of
> the evidence would have led counsel to change his recommendation as to the plea.
> This assessment, in turn, will depend in large part on a prediction whether the
> evidence likely would have changed the outcome of a trial. . . . As we explained in
> *Strickland* [], these predictions of the outcome at a possible trial, where necessary,
> should be made objectively, without regard for the "idiosyncracies of the
> particular decisionmaker."

*Id.* at 59-60 (quoting *Strickland*, 466 U.S. at 695).

Here, the Government is correct that Petitioner's suggestion that he might have forsaken

the guilty plea that took the death penalty off of the table and insisted on going to trial instead

"fails again to consider, or perhaps more accurately, purposely avoids any discussion of the

evidence in this regard." Gov't Opp'n at 54. As the Background section above includes an

exhaustive discussion of that evidence, the Court only briefly reiterates that it included:

• An eyewitness identification of Petitioner by a surveillance officer when

he exited the undercover vehicle before returning to shoot Trooper
Toatley. *See* Gov't Opp'n at 11 n.8.[15]

- The tracking of Petitioner's flight path by accredited bloodhounds and the
  recovery of a key chain with a tag with the word "Kofi" written on it along
  that flight path. *Id.* at 12-13 & n.10. Significantly, the key on the key
  chain fit the silver Mercedes that Petitioner drove to meet Trooper Toatley,
  and inside a pocket on the key chain investigators found a newspaper
  obituary for the friend whose death Petitioner and Trooper Toatley
  discussed during their drive to the 2000 block of Douglas Street, NE. *Id.*
  at 13 n.11.

- The FBI's analysis of DNA taken from the .380 caliber slug found outside
  of the undercover vehicle, which revealed it as the bullet that killed
  Trooper Toatley. Plea Tr. at 24:23-25:8.

- The recovery of a Lorcin 380–a gun identified by the FBI as consistent
  with having fired the bullet that killed Trooper Toatley–along the flight
  path traced by the bloodhounds. Gov't Opp'n at 13-14. The serial number
  on the recovered Lorcin 380 matched that of a Lorcin 380 that Petitioner
  had obtained from a friend during the weeks before Trooper Toatley's
  shooting. *Id.*

- The FBI's analysis of DNA taken from the cigarette butt found near the
  undercover vehicle, which determined that Petitioner's DNA matched the
  DNA on the cigarette butt and that Petitioner's DNA "profile is extremely
  unusual such that [] the odds of duplication of such a profile are one in 570
  quadrillion; that is, 570 followed by 15 zeroes." *Id.* at 14.

Had Petitioner gone to trial, in addition to this evidence, the Government would have been able

to introduce the videotapes of Trooper Toatley's shooting. The Court has closely reviewed those

videotapes and, as discussed above, they reveal that:

- Petitioner was the individual who met with Trooper Toatley on the night

---

[15] Petitioner's Reply ambiguously refers to "the issue of the proof problem with respect to
[sic] sequence of events portrayed on the videotape of the shooting and certain inconsistent
statement [sic] made by the backup law enforcement officers concerning their location at the time
of the shooting." Pet.'s Reply 27. Petitioner does not identify the "issue" to which he refers, but
admits that it is "arguably collateral." *Id.* The Court has no basis for suspecting that Petitioner's
vague reference to an "issue" undermines the significance of the eyewitness identification.

of October 30, 2000.  Although Petitioner's face is not visible when Trooper Toatley is shot, Petitioner wore a distinctive GAP sweatshirt to the meeting, which is clearly visible throughout most of the drive to the 2000 block of Douglas Street, NE.  That sweatshirt is clearly visible during Trooper Toatley's actual shooting.

• The purported purpose of Petitioner's meeting with Trooper Toatley was to engage in a drug transaction, and Trooper Toatley was under the impression that Petitioner would be bringing crack cocaine to the meeting with him.  Instead, Petitioner directed Trooper Toatley on an over fifteen minute drive to a dark and secluded location of Petitioner's selection.

• During the course of that lengthy drive, Petitioner and Trooper Toatley engaged in friendly, jocular conversation.  Trooper Toatley's comments during the drive were in no way threatening or coercive; however, Petitioner and Trooper Toatley explicitly discussed a number of scenarios in which an individual sought revenge after being crossed.

• Upon arriving at Petitioner's selected location, Trooper Toatley produced $3,500 in cash and began counting it out for Petitioner.  Petitioner declined to have Trooper Toatley count it, saying that he trusted Trooper Toatley, and took the cash from Trooper Toatley.  Before Petitioner exited the vehicle, Trooper Toatley jokingly asked Petitioner whether he was going to run with the money, and Petitioner jokingly responded that Trooper Toatley was "disrespecting" him.

• Petitioner exited the undercover vehicle, returned briefly to tell Trooper Toatley his lights were on, and then went around the corner for a few minutes.

• Petitioner returned to the undercover vehicle and stood outside of the passenger window while he took three puffs on his cigarette and crushed it out.

• Petitioner opened the door to the undercover vehicle and did not respond when Trooper Toatley asked him whether everything was alright.  When Petitioner opened the door to the vehicle, Trooper Toatley was sitting with his hands in his lap and there was no provocation or argument between the two.

• Petitioner withdrew the Lorcin 380 from the front pocket of his GAP sweatshirt and pointed the gun directly at Trooper Toatley's head.  Although Trooper Toatley attempted to push the gun away, and was slightly successful in doing so, Petitioner did not change his course of

79

action.  Instead, Petitioner brought the gun back to bear on Trooper
Toatley and shot him in the right side of the head at close range.

- Before fleeing the scene, Petitioner paused briefly to observe Trooper
Toatley.

In order to prevail on his ineffective assistance of counsel claim, Petitioner must establish

a reasonable probability that he would have insisted on going to trial, in the face of the evidence

against him, if his Plea Counsel had only acted otherwise.  In his Affidavit, Mr. O'Toole states

his conclusion that

> Having viewed the video tape and knowing that [Petitioner] entered the
> undercover vehicle with a gun and with no prospects to produce the drugs he was
> 'selling,' there was no doubt in my mind that the government could prove to the
> satisfaction of any reasonable juror that [Petitioner] had the requisite
> premeditation and deliberation [for a first degree murder conviction] when he shot
> and killed Trooper Toatley.

O'Toole Aff. ¶ 14.  Having likewise thoroughly reviewed the evidence against Petitioner,

including the videotapes, the Court must reach the same conclusion.  It is therefore inconceivable

that Petitioner would have gone to trial in the face of this evidence, thereby risking a death

penalty verdict, or that if he had done so he would have been acquitted of first degree murder.

*Cf. Hill v. Lockhart*, 474 U.S. at 59.  By pleading guilty, Petitioner altogether removed the

possibility of a death penalty verdict, and the Court cannot conclude that Petitioner was

prejudiced by his Plea Counsel's advice that he accept such a plea or tactics in convincing

Petitioner to accept such a plea.[16]

---

[16] In his Reply, Petitioner "concedes that [] a trial conviction may have been certain," but
nevertheless argues that he might only have been convicted of a D.C. Code offense of felony-
murder, which carries a minimum sentence of thirty years and a maximum sentence of life
imprisonment without release, and thus "may have escaped a sentence of life without the
possibility of release if he had gone to trial."  Pet.'s Reply at 26.  Petitioner, however, was not
charged with felony-murder under the D.C. Code, but rather with first degree murder under 18

## IV: CONCLUSION

For the foregoing reasons, the Court concludes that Petitioner has failed to establish that a hearing is necessary on his Section 2255 Motion, and has further failed to establish that he is entitled to relief on that Motion.  The Court shall therefore deny Petitioner's [82] Section 2255 Motion and shall dismiss the above-captioned criminal and civil cases in their entireties. An appropriate Order accompanies this Memorandum Opinion.

Date:   August 25, 2008

                                        _____/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge

---

U.S.C. §§ 1121 and 924(j).  Moreover, in support of this claim, Petitioner suggests that a jury may have been swayed by the fact that Petitioner was unaware that Trooper Toatley was a law enforcement officer when he shot him, but also admits that "this ignorance of the decedent[']s status is legally immaterial with regards to proof of the offense," in this case, first degree murder pursuant to 18 U.S.C. § 1121.  *Id.*  Petitioner further suggests that he may have been able to claim that he "acted in preemptive self-defense" in killing Trooper Toatley because "he reasonably concluded . . . because of [Trooper Toatley's] convincing portrayal of a harden[ed] drug trafficker [that] . . . he simply could not just rob Officer Toatley of the $3500, and simply walk away, and live without fear of certain retribution." *Id.* at 27.  If anything, however, Petitioner's claim that he was convinced by Trooper Toatley's undercover persona might have provided the jury with evidence of Petitioner's motive in deciding to kill Trooper Toatley after taking $3,500 in cash from him and returning with no crack cocaine in exchange.